IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO:  10-51885-CA-32

CHRIS KORGE, individually,

     Plaintiff,

vs.

CLAUDIO OSORIO, individually, AMARILIS OSORIO, individually, CRAIG TOLL, individually, INNOVIDA HOLDINGS, LLC, a Florida limited liability company,

     Defendants.

_____/

## RECEIVER'S FIRST INTERIM (INITIAL) REPORT INCLUDING APPLICATION FOR AWARD OF FEES AND EXPENSES

**All information provided herein is based on the knowledge of the Receiver at this time.  This information may change, and this Report is expressly subject to supplement and modification as new facts are learned and/or discovered.**

Mark S. Meland, Esquire, in his capacity as receiver (the "*Receiver*") of InnoVida Holdings, LLC ("*InnoVida*"), pursuant to the *Order Directing Appointment of Mark S. Meland, Esq. as Receiver of InnoVida Holdings, LLC* entered on March 4, 2011, files his First Interim Report for the period March 4, 2011 through March 24, 2011, and states as follows:

## BACKGROUND

1.     On or about September 23, 2010, Chris Korge (the "*Plaintiff*") filed a complaint commencing this case.  The complaint was amended on February 16, 2011.

2.      On or about November 4, 2010, the Plaintiff filed the Pre-Hearing Brief in Support of Appointment of Receiver.

3.      At a hearing held on March 1, 2011, the Court orally announced Mr. Meland's appointment as receiver for InnoVida. On March 4, 2011, the Court entered the Order Directing Appointment of Receiver. Thereafter, an Order Granting Receiver's Emergency Motion to Clarify Order Directing Appointment of Mark S. Meland, Esq. as Receiver of InnoVida Holdings, LLC and for Other Emergency Relief (the "*Order*") was entered.  Pursuant to the Order, Mr. Meland was appointed Receiver of InnoVida and the following entities:

a.      InnoVida US LLC
b.      InnoVida Services, Inc. f/k/a InnoVida Holdings, Inc.
c.      InnoVida Cyprus
d.      InnoVida SE Construction, LLC
e.      InnoVida MRD, LLC
f.      InnoVida Germany GmbH
g.      InnoVida Factories, Ltd. f/k/a InnoVida Holdings, Inc. (Cayman)
h.      InnoREZ GmbH
i.      InnoVida InnoREZ (Cayman)
j.      InnoVida Procurement Ltd. (Cayman)
k.      Inpro (Hong Kong)
l.      InnoVida Haiti Ltd.
m.      InnoVida Southeast, LLC
n.      InnoVida Mississippi LLC f/k/a InnoVida GoZone, LLC
o.      InnoVida Central Florida LLC
p.      InnoVida Manufacturing SE, LLC f/k/a InnoVida Factory, LLC
q.      InnoVida Miami, Inc.
r.      InnoVida Solutions, LLC d/k/a WSG InnoVida, LLC
s.      InnoVida Southeast Construction, LLC
t.      InnoVida Construction SE, LLC
u.      InnoVida Innorev, Ltd.
v.      InnoVida Holdings, Ltd.
w.      InnoVida, Inc.

Together with InnoVida Holdings, LLC, the entities identified in "a" thru "w" above are referred to as the "*InnoVida Entities*."

4.      Paragraph 16 of the March 4, 2011 Order states that:

2

Within twenty (20) days of [the] Order, the Receiver shall file an Initial Report with the Court summarizing his activities, providing an accounting of funds, assets and property in his possession, and reporting the status of any legal issues or claims. The Receiver shall include in that Initial Report an application for an Order approving payment of all reasonable fees and expenses [of his retained professionals].

## THE BUSINESS OF INNOVIDA

5.     According to its website at www.innovida.com, InnoVida "manufactures building solutions that bridge the gap between energy efficiency, affordability and high quality. Using its proprietary technology InnoVida manufactures Fiber Composite Panels (FCP) which are used to build residential, commercial, government, military, globally relevant structures without the use of cement, steel or wood and with significant savings in cost to build, time to build and energy cost to operate."

6.     InnoVida f/k/a Coeg, LLC is the holding company and corporate parent of the other InnoVida Entities (see Organization Structure Charts attached as Exhibit A).

7.     InnoVida Services, Inc. f/k/a InnoVida Holdings, Inc. ("*ISVS*") is the operating company.

8.     InnoVida Southeast, LLC ("*ISE*") is the factory management/production company.

9.     InnoVida MRD, LLC ("*IMRD*") is the factory workers / production company.

10.     Corporate books and records, including tax returns, have been requested.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

11.     InnoVida was incorporated on March 21, 2006 in the State of Florida.   InnoVida is a holding company which owns ownership interests, directly or indirectly, in the other InnoVida Entities.

12.     InnoVida is owned, upon information and belief, 83% by Claudio Osorio and other immediate family members, 9.6% by Serenity Holdings and the balance of 7.4% by other, smaller investors.  The Receiver is aware that Engin Yesil and/or entities affiliated with him have filed litigation asserting a claim to some portion of this interest.

13.     During the period from January 1, 2010 forward, the period for which pertinent accounting records are readily available,[1] those records reflect that customer deposits and project related revenues totaling over $8 million were received into InnoVida, including approximately $2 million for projects which have either not been commenced or for which only marginal work has been performed.  Additionally, InnoVida received $2.7 million from investors Messrs. Korge and Rabin, loan proceeds of $3.2 million from Overseas Private Investment Corporation ("*OPIC*"), and over $2 million from  InnoVida Innorez, Ltd.  The records reflect that these monies were disbursed by InnoVida primarily to InnoVida Southeast, LLC and InnoVida Services, Inc.

14.     In addition to its ownership interest in certain Innovida Entities, InnoVida's other assets appear to include intercompany receivables.  Loans owed to third parties exceed $9 million.

---

[1] Accounting records have not been independently confirmed or validated against banking records.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

## ISVS

15.     ISVS was incorporated on March 21, 2006 in the State of Florida.    ISVS performs centralized, administrative functions for the InnoVida Entities.  ISVS is owned 75% by InnoVida and 25% by Smartco, Inc., an entity incorporated in the Turks and Caicos Islands.

16.     During the period from  May 16, 2007 forward, the period for which pertinent accounting records are readily available,[2]  ISVS received over $6.5 million from investors Messrs. Korge, Boozer, Freeman, Rabin and other unidentified investors, $6.5MM for the Angola factory- ($3MM as a prepayment and bridge loans totaling $3.5MM) and funding  from InnoVida as needed.   ISVS disbursed over $17 million in vendor payments, payroll, legal fees, and overhead expenses.   Additionally, over $2.5MM was disbursed to Osorio owned Miami Worldwide Partners, Inc.

17.     Several transfers involving numerous bank accounts were noted in the accounting records.   The Receiver intends to investigate these transfers further to identify any unknown bank accounts.

18.     In addition to cash balances which have been turned over to the Receiver, ISVS's other assets include some equipment, computers and possible intellectual property.   Liabilities include outstanding payroll taxes and trade payables.

## ISE

19.     ISE was incorporated on August 1, 2007 in the State of Florida.   Located at 470 NE 185th Street, North Miami Beach, FL  33179, ISE was the first U.S. factory site for InnoVida's operations.   ISE  is owned 97% by InnoVida US LLC and 3% by Jared Margolis.

---

[2] Accounting records have not been independently confirmed or validated against banking records.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

20.    During the period from March 1, 2008 forward, the period for which pertinent accounting records are readily available,[3] ISE disbursed over $5 million to vendors and employees/consultants.   These monies were primarily sourced from ISVS and InnoVida.

21.    ISE's assets include inventory, machinery & equipment, and manufacturing licenses. Liabilities include intercompany payables and trade payables.    Notes payable previously issued to investors/lenders were exchanged for equity interests in InnoVida.

## IMRD

22.    IMRD was incorporated on March 28, 2008 in the State of Florida.    Its stated purpose was research and development for InnoVida's U.S. operations.   IMRD is owned 100% by ISVS.

23.    During the period from February 10, 2009 forward, the period for which pertinent accounting records are readily available,[4] IMRD disbursed over $1.5 million to vendors and employees/consultants, funded primarily by ISVS.

24.    IMRD does not appear to own other substantial assets.    Liabilities include intercompany payables.

## INNOVIDA, INC. (II)

25.    InnoVida Inc. (II) ("*II*") was incorporated on August 11, 2006 in the State of Delaware.    Intended to be a holding company, it was the first of the InnoVida Entities to be incorporated. II is not actively operating and filed its final tax return for tax year 2008.   II is wholly owned by Claudio Osorio.

26.    As of the date of this Report, the Receiver has been unable to locate any accounting or banking records for this entity.

---

[3] Accounting records have not been independently confirmed or validated against banking records.
[4] Accounting records have not been independently confirmed or validated against banking records.

## INTERNATIONAL AFFILIATES

27.    InnoVida Factories, Ltd. ("*IFL*") was incorporated on August 21, 2006 in the Cayman Islands.    Its stated business purpose was the construction and sale of factories for housing.  IFL is wholly owned by InnoVida Holdings (Cyprus) Ltd., which in turn is wholly owned by InnoVida.

28.    During the period from April 6, 2007 forward, the period for which pertinent accounting records are readily available,[5] IFL received over $11 million from the Al Safeer Group and over $11 million in total from Clade Ltd. and Serenity Holdings, Ltd.  In addition, over $6 million was received for the MRC Project in the Middle East.  IFL disbursed over $10 million for vendor payments, payroll and professional fees.    IFL also transferred substantial sums   to other InnoVida Entities and international companies.    The Receiver intends to investigate these transactions further.

## THE RECEIVER'S ACTIVITIES SINCE APPOINTMENT

29.    Upon his appointment, the Receiver retained the forensic accounting and related services of Marcum LLP and Barry E. Mukamal, CPA.  The Receiver also retained the legal services of Meland Russin & Budwick, P.A.

30.    The Receiver and his professionals have endeavored to understand the InnoVida Entities' operations, financial accounting and current financial position, while preserving all books and records located.  To that end, the Receiver and his professionals have:

    a)    Imaged the corporate servers and all workstations of corporate owners' offices and key personnel.

---

[5] Accounting records have not been independently confirmed or validated against banking records.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

b)      Gained access to the NAV system software used for accounting purposes by various InnoVida Corporate entities.

c)      Gained access to Quickbooks utilized by Miami Worldwide Partners, Ltd. d/b/a InnoVida, Inc. and Mountain Homes LLC d/b/a InnoVida.

d)      Reviewed the InnoVida companies' transactions for the last ninety (90) days as reflected in the NAV system.

e)      Reviewed the InnoVida Entities' related party and insider transactions as reflected by the NAV and Quickbooks systems for the last four (4) years.

f)      Analyzed the numerous foreign and domestic entities and their relationships to one another.

g)      Began analyzing numerous foreign and domestic bank accounts and began attempting to recover the bank statements associated with each account.

h)      Indexed and recovered all physical records that were located at InnoVida's corporate office on Miami Beach.

i)      Recovered the contents of InnoVida's personal property and records from the Miami Beach storage facility.

j)      Secured the contents of InnoVida's personal property from the Hialeah storage facility.

k)      Investigated the disposition of the $2 million of cashier's checks issued on February 24, 2011, copies of which were sent to Coffey Burlington, counsel to Mr. Korge.

l)      Analyzed the viability of the InnoVida operations, on a historical and current basis.

8

m)    Overseen the preparation of a prospective operating budget.

n)    Prepared a payroll for the pay period ended March 16, 2011.

o)    Interviewed numerous employees and InnoVida's owners and officers.

p)    Prepared numerous historical cash flow analyses.

q)    Deposed Mr. Osorio under oath regarding the financial condition and corporate relationships of the InnoVida Entities.

r)    Conducted an inventory of the raw materials and finished goods located at the factory.

s)    Searched for undisclosed and unrecorded assets.

t)    Began quantifying the InnoVida Entities' unpaid liabilities.

u)    Scaled down the U.S. based operations of the InnoVida Entities.

v)    Discussed the sale of operations with prospective purchasers.

## **FINANCIAL CONDITION**

31.    InnoVida's books and records are disorganized and incomplete. The Receiver has yet to locate all of InnoVida Entities' financial records. Moreover, Mr. Osorio has refused to cooperate in providing such data to the Receiver.

32.    Following the Receiver's appointment, he discovered that several of the InnoVida Entities were not paying their debts as they become due. Innovida is a defendant to at least fourteen known litigation matters, including an action to foreclose a blanket lien on the operating factory's assets. It is believed that, excluding any note payments and employee payroll and resulting taxes, the accounts payable exceeds $2,000,000 broken down as follows: currently totals approximately $433,000, up to 30 days totals approximately $494,000, 31-60 days totals

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

approximately $102,000 and over 60 days totals approximately $981,000.  Due to the condition of the books and records, the precise amount of payables is unknown at this time.

33.    Additionally, after being appointed, the Receiver's professionals discovered that a week prior to the his appointment, three cashier checks aggregating over $2,000,000 were purportedly issued to Mr. Korge pursuant to instructions by Ms. Gamboa and Mr. Osorio.  *See* Composite Exhibit B.  Based upon the memo line of the checks, they appeared to be intended to facilitate "settlement discussions" with the Plaintiff.

34.    Based on a review of the pertinent bank records and interviews of bank representatives, the Receiver believes that in fact there never was over $2,000,000 in outstanding cashier checks.

35.    Instead, on February 23, 2011 the ending account balance in ISVS's Wachovia Account *4270 was $172,490.  On February 24, 2011, a transfer was made from InnoVida's Wachovia Account *7744 in the amount of $610,000, resulting in approximately $782,000 of available funds in ISVS' account on February 24, 2011.  That same day, Ms. Gamboa approached Teller No. 907 at the Wachovia Lincoln Road branch and purchased a cashier check for $750,000 made payable to "Cofey Burlington."  Ms. Gamboa then brought the original cashier check to InnoVida's office and photocopied it.

36.    Thereafter, Ms. Gamboa returned to the bank approximately one hour later and informed the teller that the memo line was misspelled (*i.e.*, "Cofey" should have been spelled "Coffey").  Accordingly,  the original cashier check was returned to Wachovia and a *second* cashier check issued.  Again, Ms. Gamboa brought this second cashier check to InnoVida's office and photocopied it.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

37.     Thereafter, Ms. Gamboa returned to the bank and advised the teller that the cashier check in fact ought to be in the amount of $500,000. Therefore, the second cashier check in the amount of $750,000 was returned to Wachovia and a *third* cashier check was issued for $500,000. Ms. Gamboa then returned to InnoVida's office and copied this third check.

38.     On March 1, 2011, the third cashier check for $500,000 was re-deposited in ISVS's Wachovia Account *4270. On March 2, 2011, $465,278 was transferred back to InnoVida's Wachovia Account *7744, effectively completing the cycle of the movement of monies.

39.     The Receiver has been unable to discern any legitimate or lawful business purpose for this sequence of events. When questioned under oath asked about these checks at his recent deposition conducted by the Receiver's counsel, Mr. Osorio invoked his Fifth Amendment privilege against self incrimination.

40.     Further, despite tax records suggesting historical bank account balances of tens of millions of dollars in foreign situs accounts, there has been no documented explanation by Mr. Osorio or any other employee at InnoVida for the current lack of cash and inability to pay basic operating expenses.

41.     The value of the InnoVida Entities' tangible assets remain undetermined primarily due to Mr. Osorio and Mr. Toll's failure to provide complete financial information and Mr. Osorio's later invocation of his Fifth Amendment privilege against self incrimination.

42.     Four deposit accounts were located at Wachovia, a Wells Fargo company, three of which were overdrawn due to bank service charges and the last account held a balance of approximately $292,000, of which approximately $40,000 was used to pay insurance premiums,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

wage claims (from March 4, 2011 to end of pay period), resulting payroll taxes, and certain necessary utilities. The check register balance as of March 24, 2011 is $206,672.86.

43.    Upon his appointment, the Receiver contacted InnoVida's insurance agent to confirm all required insurance was in place.    The Receiver learned that litigation was commenced for failure to pay amounts related to a worker compensation audit and that current insurance premiums were past due.    The Receiver had available funds to pay these premium payments and so insurance remains in full force and effect.    Attached as Composite Exhibit C is a copy of each Certificate of Liability Insurance and Certificate of Property Insurance, reflecting the Receiver as a Certificate Holder.

## SCALEDOWN OF OPERATIONS

44.    In considering whether to operate this business at the current pace, the Receiver has considered pro forma expenses, including: (1) payroll (approximately $164,935 every 2 weeks); (2) factory rent (monthly rent of $16,794.72 with February and March unpaid); (3) Lincoln Road office rent (March rent is unpaid); and (4) Insurance premiums ($26,087.11).    The only known funds available to the Receiver are an aggregate of approximately $292,000 held at Wachovia and $12,000 held at Royal Bank of Canada in Cayman (this account was frozen at the Receiver's directive).    One receivable, in the amount of $5,000, has been collected and it is uncertain what receivables will be collected in the future months.

45.    Given the clear inadequacy of the available cash to pay the immediate expenses, the Receiver convened a meeting at Innovida's Miami Beach offices on March 8th at approximately 3:00 p.m. with his financial professionals and Mr. Osorio.    At the meeting, the Receiver specifically asked Mr. Osorio to identify all available, identifiable sources of funds to pay ongoing operating expenses.    Mr. Osorio indicated none existed.    When asked how previous

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

payrolls had been funded in the weeks leading up to the receivership, Mr. Osorio was unable to provide a cogent, intelligible response.

46.     Because of the eroding nature of InnoVida and its subsidiaries operations, the Receiver requested, and was granted the authority based on the exercise of his business judgment, to alter and scale down the operations of InnoVida and its subsidiaries as required to ensure no further dissipation of assets or operating losses.  In addition, the Receiver was granted the authority, if appropriate in his business judgment, to file a voluntary Chapter 11 petition for InnoVida or any combination of its affiliates pursuant to Title 11 of the United States Code.

47.     While it is unclear whether the operations of InnoVida and its subsidiaries could be profitable, it is clear that there are inadequate identified funds to pay ongoing operating expenses.  Accounts payable are not being paid as they become due and there are past due payroll taxes, factory location rent, and insurance premiums.

48.     Since being appointed, the Receiver identified critical staff that needed to be retained.  Other employees were laid off and operations were scaled down considerably due to the lack of funds.

### LACK OF COOPERATION OF KEY OFFICERS AND DIRECTORS

49.     Mr. Osorio has failed to adequately provide a host of information related to priority issues regarding the InnoVida Entities.  The Receiver's professionals have also learned that Mr. Osorio instructed the deletion of over 5,000 of his emails.

50.     Additionally, despite numerous oral, written and emailed requests, the Receiver has yet to be provided complete banking records, complete information relating to inter-company transfers, complete information regarding sources of funds to pay business operations, as well as other data pertaining to the operations of InnoVida.  In short, there has been a lack of adequate

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

cooperation and availability of information and documentation. Moreover, Mr. Osorio has not complied with the directive in this Court's Order, in particular the financial reporting requirements set forth in paragraph 5 and invoked his Fifth Amendment privilege against self incrimination at his March 11, 2011 deposition to questions regarding the finances of the InnoVida Entities.

51.    Mr. Osorio and Ms. Gamboa have failed to explain the transfer of millions of dollars to Miami Worldwide Partners, Inc. d/b/a InnoVida, Inc.  In particular, bank records for that entity reflect that InnoVida, over a multi year period, wired this entity millions of dollars. No adequate documentation or explanation has been provided supporting valid business reasons for such transfers.

52.    Mr. Osorio and his wife, Amarilis Osorio, together filed a personal Chapter 11 bankruptcy petition on March 17, 2011, assigned Case No. 11-17075-RAM, a copy of the Petition and Schedules is attached as Exhibit D.   The filing of the bankruptcy has, at least temporarily, precluded the Receiver from seeking relief before this Court regarding Mr. and Mrs. Osorio's refusal to comply with the Orders of this Court.

## FOREIGN ACCOUNTS AND UNACCOUNTED FOR CASH

53.    A review of a copy of the Report of Foreign Bank and Financial Accounts, IRS Form TD F 90-22.1(rev. 10-2008)[6] for the calendar year ended December 31, 2009 and signed by Mr. Toll, reflects that InnoVida had twelve foreign situs accounts with "maximum value[s] of account[s] during calendar year reported" aggregating over $37,500,000.  The Receiver has been provided no adequate explanation or supporting documentation as to what happened to those funds.

---

[6] The Form states, "[t]his form should be used to report a financial interest in, signature authority, or other authority over one or more financial accounts in foreign countries, as required by the Department of the Treasury Regulations (31 CFR 103).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

54.     The records for the account held at Wachovia Bank n/k/a Wells Fargo, specifically, account ending 8744 owned by InnoVida reflects numerous transfers to and from foreign situs banks and to and from affiliates.

55.     The Receiver has reason to believe that there are significant foreign held assets, in particular cash, that will ultimately be traced to InnoVida, its subsidiaries, Mr. Osorio and his wife or entities or persons under their direction or control.    During recent discovery in this proceeding, documentation was produced reflecting the deposit of tens of millions of dollars in cash at Royal Bank of Canada (Grand Cayman); yet, today, Royal Bank of Canada (Grand Cayman) has indicated that the balance is approximately $12,000.    The Royal Bank of Canada has refused to provide the Receiver copies of historical statements due to local procedures it says are required.

56.     When questioned informally about these accounts, Mr. and Mrs. Osorio provided no adequate explanation.    When examined under oath about these accounts, Mr. Osorio invoked his Fifth Amendment privilege against self incrimination.    Notably, although Mr. Osorio claims that he holds no control over these accounts, other senior members of the InnoVida Entities have refuted this position.    Moreover, at least for some period of time, bank statements for these accounts were not sent to InnoVida's offices, but instead, directly to Mr. Osorio's personal residence in Miami Beach.

## **PENDING LITIGATION**

57.     Attached as Exhibit E is a list of the known pending litigation.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

## ISE FACTORY OPERATIONS

### a)    Initial Site Evaluation

58.    ISE's factory operates from a warehouse/office complex located at 470 NE 185th Street, North Miami Beach, Florida. On March 7, 2011, ordinary factory operations commenced at 6:30 a.m. Access to the factory was overseen by the Receiver's professionals who provided InnoVida personnel access to the factory at that time. Approximately eleven administrative and thirty-two factory employees reported for work.

59.    The Receiver's professionals identified factory management personnel in order to begin the process of determining the status of operations in support of ongoing projects. The identified management personnel, Vice President of Operations, Vice President of Factory Operations, and Controller were immediately tasked by Receiver professionals in accordance with the Receiver's directives, to provide an operational overview and a tour of the factory to demonstrate that work in progress was being conducted in a safe and orderly manner, which would allow for continued operations while the Receiver considered operational viability. At the time of this inspection, all administrative personnel, factory workers and senior personnel appeared to be tending to their duties in a safe and orderly manner. As a result of these initial observations the Receiver authorized continuation of operations until a determination could be made whether overall operations are viable.

60.    During the factory tour, the Receiver's professionals inspected the physical plant for gross deferred maintenance conditions. The initial inspection found the administrative area clean and orderly. The factory area was disorderly but revealed no gross deferred maintenance conditions. The condition of the physical plant appeared fair and typical of a manufacturing

16

facility producing fiberglass composite panels. There was no inspection seeking to reveal potentially latent conditions.

61.    The inspection did result in the observation of various potentially hazardous chemicals (acetone, epoxy resin, etc.) which are stored in various types of containers throughout the facility. The Receiver intends to attempt to identify hazardous substances and take action to dispose of those substances in strict accordance with governing local, state and federal guidelines.

### b)    Factory Personnel

62.    As indicated above, upon arrival on March 7, 2011, the Receiver's professionals observed two divisions of employees, administrative and factory. The factory administrative staff was comprised of approximately eleven employees. They provided logistical support, architectural and engineering support, general office support and management. The Receiver's professionals did not interview each and every administrative staff member. However, through interaction with management and various members of the administrative staff, the initial observation was that they were reasonably competent and motivated in the performance of their delegated responsibilities.

63.    Factory employees are defined as those employees physically performing the manufacturing process. The product being manufactured appears to be the fabrication of fiberglass composite panels. These manufactured panels are cut to a particular specification based upon project specific requirements. Those panels are then assembled into a physical structure such as residential house or commercial structure such as an office building, hospital, or school.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

64.     On March 7, 2011 there were approximately thirty-two factory employees actively manufacturing panels.  The Receiver's professionals received an orientation of the manufacturing process from the Vice President of Operation, Vice President of Factory Operations and the Controller.  This orientation, coupled with a physical observation of the operation, reasonably demonstrated that the manufacturing process observed was consistent with the product allegedly being delivered.  Further, cursory review of the factory employees and the factory level management oversight reflected that this personnel appeared to be knowledgeable and competent within their delegated responsibilities.

65.     As discussed above, the lack of adequate cash resources resulted in a decision by the Receiver to halt operations and dismiss all administrative and factory employees.  In accordance with the Receiver's directive on March 10, 2011, the Receiver's professionals assembled the factory employees and advised them of their dismissal.  Likewise on that same date, the administrative employees were assembled and advised of their dismissal.

66.     As of the date of this Report, in direct support of the ISE factory component, the Receiver identified and retained five InnoVida employees in order to (i) preserve as long as possible manufacturing and operational memory; and (ii) utilize their knowledge of the business operation to identify and analyze the status of incomplete projects; assemble a proposed operating budget; assist in the completion of the initial inventory of assets; identify assets not owned by the company and organize their return to the proper vendor or service provider; and perform miscellaneous administrative duties.  The retained employees include the Vice President of Operations, Vice President of Factory Operations, Logistics Specialist, Sales Specialist and Controller.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

67.     The Controller also supports the forensic accounting and ongoing bookkeeping support function in addition to those duties above defined for factory support.  His duties and that of the retained information technology specialist are further described in this report.

68.     The Receiver arranged for one employee operating in Haiti to obtain an airline ticket to enable him to return home to South Florida.  This employee was advised of his dismissal on March 10, 2011.

### c)     Project Management and Overview

69.     Between March 7, 2011 and March 10, 2011, the Receiver sought to gain an understanding of ongoing projects in order to determine operational viability.  The purpose was to determine whether or not income could be derived from ongoing projects, based on a utilization of the resources on hand to pursue completion of those projects, and whether there was a reasonable expectation of generating positive cash flow.  During this initial project review, insufficient information was provided by Messrs. Osorio and Toll demonstrating that any project order could be fulfilled with the resources on hand and that completion of any project would result in a monetary recovery in an amount necessary to offset the risk of pursuing completion.

70.     The first operational problems presented to the Receiver raised serious concerns about project viability.  Two shipments of project materials totaling sixteen containers were in question.  Two of the containers were sitting in dispute in a port in Haiti.  Nobody in the factory management could explain why the shipment was in dispute.  Neither Mr. Osorio nor Mr. Toll could coherently explain the nature of the dispute or how it could be resolved.  As of the date of this Report, the dispute remains unresolved.

71.     Additionally, twelve or thirteen containers were en route to Mombasa, Kenya.  Correspondence from the shipping company indicated that they were owed sums in excess of

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

$120,000 on multiple unpaid invoices. Messrs. Osorio and Toll could not explain what had occurred nor could they identify a viable resolution. As a result, the shipping company would not deliver the shipment. As of the date of this Report, the entire shipment remains in dispute with the shipping company.

72.    Of paramount concern was management's inability to demonstrate any coherent form of project management. The entire process appeared to be fragmented by design. It was reported that communication among factory management was prohibited. Directives were fed by senior level management (namely, Mr. Osorio and Mrs. Osorio) to factory level management. Each factory level manager appeared to attempt to respond to each directive without the benefit of coordination.

73.    It was not until approximately March 17, 2011 (a week after operations were halted), that factory level management was able to assemble even the most basic project information. The basic information provided is summarized in the Southeast Project Status Snapshot attached at Exhibit F. Ten of the projects presented in the snapshot show progress, eight of which were significant. The remaining projects show little or no progress.

74.    Project level accounting procedures are still being evaluated. The snapshot indicates that substantial resources would have to be expended in order to complete the projects, even those near completion. In each case it appears that more would have to be spent to complete the project than would be owed to the company for completing the project.

75.    Significant analysis would have to be conducted in order to complete a project profitability analysis. Such analysis would be difficult to justify due to the poor manner in which senior management chose to conduct project management and the resulting lack of coherent project data. The Receiver utilized factory management with the cooperation of an interested

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

customer to analyze a possible scenario whereby the Receiver would ramp up operations to complete one phase of one existing project. The customer withdrew its interest as the analysis showed that the cost to complete the project exceeded the amount they were willing to spend.

76.     Therefore, the Receiver has determined that project administration at the senior level is so severely deficient that absent a commercially reasonable project pricing analysis, there can be no reasonable expectation of the viability of existing projects at the Southeast factory. However, the Receiver is considering possible alternatives.

## INITIAL INVENTORY

77.     Attached as Composite Exhibit G is an inventory completed through a collective effort of certain retained employees of InnoVida, including an inventory for the UAE RAK facility.

78.     This is an "Initial Inventory." The initial inventory is preliminary and requires testing analysis to provide for data integrity as well as the assembling of supporting data. Due to the volume of inventory, it will likely require 30 to 45 days to confirm the inventory.

79.     Further, the inventory contains both items owned by InnoVida as well as equipment and materials for which payment has not been made. The Receiver through his professionals are attempting to clearly identify these unpaid items in order to make preliminary preparations for the return of such equipment and materials which are not owned by the company.

## FEES AND EXPENSES INCURRED BY MARK S. MELAND, RECEIVER

80.     From inception to March 20, 2011, Mark S. Meland, Receiver of the InnoVida Entities has incurred fees of $78,108.50 and costs of $310.76, totaling $78,419.26. Attached as Exhibit H is the Receiver's invoice.

### FEES AND EXPENSES INCURRED BY MELAND RUSSIN & BUDWICK, P.A., AS COUNSEL TO MARK S. MELAND, RECEIVER

81.     From inception to March 20, 2011, Meland Russin & Budwick, P.A., as counsel to Mark S. Meland, Receiver of the InnoVida Entities has incurred fees of $144,245.50 and costs of $3,992.05, totaling $148,237.55. Attached as Exhibit I is the Meland Russin & Budwick, P.A.'s invoice.

### FEES AND EXPENSES INCURRED BY MARCUM LLP, AS FORENSIC ACCOUNTANTS TO MARK S. MELAND, RECEIVER

82.     From inception to March 20, 2011, Marcum LLP, as forensic accountants to Mark S. Meland, Receiver of the InnoVida Entities has incurred fees of $105,029.50. Attached as Exhibit J is the Marcum LLP's invoice.

83.     The Receiver requests the Court to approve of the fees and expenses incurred by himself as Receiver, Meland Russin & Budwick, P.A. as legal counsel and Marcum LLP as forensic accountants. The Receiver does not necessarily seek payment at this time due to the limited availability of funds.[7]

### BANKRUPTCY PETITIONS

84.     On the date of the filing of this Report, the Receiver intends to file voluntary petitions under Chapter 11 for the following entities: (1) InnoVida Holdings, LLC f/d/b/a Coeg, LLC; (2) InnoVida Services, Inc. f/d/b/a InnoVida Holdings, Inc.; (3) InnoVida Southeast, LLC; and (4) InnoVida MRD, LLC. The Receiver, in consultation with his professionals, has determined that it is in the best interests of these entities and their creditors for these entities to be placed into bankruptcy. It is possible that other InnoVida Entities will likewise be placed into bankruptcy and/or be substantively consolidated in the future. These filings are necessitated by

---

[7] The Receiver and his professionals reserve the right to seek allowance of these fees and costs pursuant to Section 543(c) of the Bankruptcy Code in connection with any bankruptcy filings by any of the InnoVida Entities.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

the need to stay pending litigation and other judgment enforcement mechanisms, as well as to promote the possibility of a sale of assets of business lines pursuant to applicable provisions of the Bankruptcy Code.    In addition, the Bankruptcy Code codifies an established claims resolution and litigation recovery process that will inure to the benefit of the entities and their creditors.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail on March 24, 2011 upon:

Kendall B. Coffey, Esquire
Benjamin H. Brodsky, Esquire
Coffey Burlington
2699 S. Bayshore Dr, Penthouse
Miami, FL 33133

Robert Zarco, Esquire
Alejandro Brito, Esquire
Zarco, Einhorn & Salkowski, P.A.
100 SE 2 St, Ste 2700
Miami, FL 33131

Casey H. Cusick, Esq.
Abbey L. Kaplan, Esq.
Kluger, Kaplan, Silverman, Katzen & Levine, P.L.
201 S. Biscayne Blvd., Ste 1700
Miami, FL 33131

Alice K. Sum, Esquire
Espirito Santo Plaza
1395 Brickell Avenue
14th Floor
Miami, Florida 33131

David A. Nunez, Esquire
Meyer & Nunez, P.A.
150 W. Flagler St., Suite 2700
Miami, FL 33130

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363
{Firm Clients/3407/3407-1/00862398.DOC.}

Claudio and Amarilis Osorio
15 Star Island
Miami Beach, FL 33139

Respectfully submitted,

_____
Mark S. Meland, Esquire,
as Receiver and only as Receiver
of the InnoVida Entities
Florida Bar No. 768634

MELAND RUSSIN & BUDWICK, P.A.
Attorneys for Receiver
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone:    (305) 358-6363
Telefax:        (305) 358-1221

By: _____
    Michael S. Budwick, Esquire
    Florida Bar No. 938777
    mbudwick@melandrussin.com