

**ORDERED in the Southern District of Florida on August 01, 2011.**

Robert A. Mark, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

INNOVIDA HOLDINGS, LLC,
et al.,

          Debtors.

_____/

Case No. 11-17702-RAM
Case No. 11-17704-06-RAM
Chapter 11
Jointly Administered

**ORDER (I) APPROVING TRANSFER AND SALE OF PATENT APPLICATIONS TO INNOVIDA HOLDINGS, LLC; (II) AUTHORIZING TRUSTEE TO EXECUTE ASSET PURCHASE AGREEMENT AND TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; (III) APPROVING NOTICE PROVISIONS; (IV) APPROVING COMPETITIVE BIDDING PROCEDURES; (V) SCHEDULING AN AUCTION; AND (VI) SCHEDULING A HEARING TO APPROVE THE SELECTION OF THE HIGHEST AND BEST OFFER AND CERTAIN RELATED RELIEF**

THIS CAUSE came before the Court for hearing on July 29, 2011 at 10:00 a.m. upon

Mark S. Meland's, in his capacity as Chapter 11 Trustee (*"Trustee"*) of InnoVida Holdings, LLC

(*"Holdings"*), InnoVida Services, Inc. (*"Services"*), InnoVida Southeast, LLC (*"Southeast"*)

and InnoVida MRD, LLC (*"MRD"*)(collectively, Holdings, Services, Southeast, and MRD shall

be referred to as the *"Debtors"*), Motion for entry of an Order (i) Approving the Transfer and

Sale of Patent Applications to Innovida Holdings, LLC; (ii) Authorizing Trustee to Execute the Asset Purchase Agreement attached hereto, and to Sell Assets Free and Clear of Liens, Claims, and Encumbrances with Valid and Enforceable Encumbrances Attaching to the proceeds of the Sale; (iii) Approving Notice Provisions; (iv) Approving Competitive Bidding Procedures (the *"Bidding Procedures"*); (v) Scheduling an Auction (the *"Auction"*); and, (vi) Scheduling a Hearing to Approve the Selection of the Highest and Best Offer and Certain Related Relief (the *"Sale Procedures Motion"*) [ECF No. 242]. The Court has considered and reviewed the Sale Procedures Motion, has heard and considered arguments of counsel, has considered the Court file, has noted the agreement reached between CCH Housing, LLC (*"CCH"*) and the Trustee, and has noted the Unsecured Creditors' Committee's approval of the Sale Procedures Motion. Accordingly, and for the reasons stated on the record, the Court makes the following findings and conclusions:

A.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1408 and 1409. The statutory basis for the relief sought herein are §§ 105(a) and 363 of Title 11 of the United States Bankruptcy Code.

B.     The Trustee has provided sufficient grounds for approval of the Sale Procedures Motion, the Auction, and Bidding Procedures.

C.     The Auction and Bidding Procedures are reasonable and appropriate, and the sale of the Assets[1] via the APA between the Trustee and Milport Associates, S.A. (*"Milport"*) is in the best interests of the Debtors' estates, subject to higher and better offers which may result from the Auction.

---

[1] All capitalized terms have the same meaning ascribed to them in the Sale Procedures Motion, unless otherwise noted herein.

D.      The Trustee has properly marketed the sale of the Assets.

E.      The purchase of the Patent Applications by Holdings from Factories for $20,000.00 is appropriate.

F.      Proper, timely, sufficient notice of the Sale Procedures Motion and the subject notice of hearing on the Sale Procedures Motion has been provided in accordance with 11 U.S.C. §102 and Fed. R. Bankr. P. 2002 and 6004.

G.      Section 3.b of the Bidding Procedures is corrected to state that the deposit amount required to be delivered to the Trustee in order to become a qualified bidder is $150,000.

H.      CCH consents to the sale of the Southeast Assets pursuant to 11 U.S.C. § 363(f) (2).

Therefore, based on the foregoing, the Court finds good cause to grant the relief requested in the Sale Procedures Motion as set forth below.  Accordingly, it is

**ORDERED** as follows:

1.      The Sale Procedures Motion is **GRANTED** in all respects.  To the extent of any conflict between the terms of the Sale Procedures Motion and this Order, the terms of this Order shall control.

2.      Holdings purchase of the Patent Applications for $20,000 from Factories is approved.  Upon the closing of the APA, Holdings shall transfer $20,000 of the Purchase Price to the receivership estate in the State Court Action styled *Chris Korge v. Claudio Osorio, Amarilis Osorio, Craig Toll and Innovida Holdings, LLC*, Case No.: 10-51885-CA-32.  In the event a closing on the APA does not occur, Holdings shall immediately transfer the Patent Applications back to Factories.

3.      The Notice of Bidding Procedures attached hereto as Exhibit "A" is **APPROVED** in its entirety.  The Trustee is authorized to immediately serve the Notice of Bidding Procedures and a copy of this Order upon: a) the United States Trustee's Office; b) all creditors of the Debtors; c) Claudio Osorio c/o Geoffrey Aaronson, Esq.; d) counsel to the Unsecured Creditors' Committee; e) all parties who have filed a notice of appearance in these cases; and, f) all parties known to the Trustee that may claim an interest in the Assets.  In addition to those parties referenced above, the Trustee shall also serve the Notice of Bidding Procedures and this Order upon: a) those persons who have contacted the Trustee and have requested notice of the Notice of Bidding Procedures and the Auction; and, b) any other person who the Trustee believes may possess an interest in purchasing the Assets of the Debtors.  Such notice shall be deemed good and sufficient notice of the sale of the Assets, Bidding Procedures, and Auction pursuant to Fed.R.Bankr.P. 2002 and 6004, and Local Rules 2002-1 and 6004-1 of the Local Rules of this Court.

4.      The Trustee is authorized to enter into the APA with Milport, which APA is attached the Notice of Bidding Procedures, and which APA is subject to higher and better offers as detailed in the Notice of Bidding Procedures.

5.      The Auction for the sale of the Assets shall take place on August 18, 2011, at 3 p.m. at the United States Bankruptcy Court, 51 S.W. First Avenue, Courtroom ~~1404~~ 1406, Miami, Florida, 33130.

6.      The resolution between the Trustee and CCH is preliminarily approved.  Specifically, CCH has agreed to the Trustee's valuation of $136,382 for the Southeast Assets. From this amount, the Trustee shall pay the Miami-Dade County Tax Collector $11,422.74 for unpaid personal property taxes on the Southeast Assets.  From the resulting balance of

$124,959.26, CCH has agreed to a 10% surcharge for the benefit of the Southeast bankruptcy estate. To the extent there are higher and better bids generated at the Auction and the value for the Southeast Assets increases above $136,382, then CCH has agreed that the Trustee shall have an additional 25% surcharge from such overage amount. In addition, the Trustee and the Unsecured Creditors' Committee shall each have until August 18, 2011, to file an objection to CCH's claim, and if an objection is not filed, the Trustee and the Unsecured Creditors' Committee agree to the allowance of CCH's claim in Holdings bankruptcy case subject to CCH providing the Trustee with a calculation of its claim, which calculation must be approved by the Trustee. In addition, any other party in interest shall have forty-five (45) days from the entry of an order approving the Auction results and the selection of the highest and best bidder to object to CCH's claim. In the event there is an objection to CCH's claim, CCH may contest the allocation of value to the Southeast Assets and request that a greater portion of the sale proceeds be reserved as applicable to the Southeast Assets. The foregoing resolution between CCH and the Trustee is contingent on the closing of the APA.

7.      Notwithstanding the foregoing, CCH reserves its right to object, at the Final Sale Hearing, to the valuation of certain raw chemicals, including the eighteen (18) containers of epoxy resin, all of which the Trustee believes has zero value. In the event CCH does object to the valuation of the raw chemicals, then the Court will hold a later hearing to determine the value of the raw chemicals; and, how the proceeds from the sale should be allocated if the Court finds that the raw chemicals have a greater value than as stated in the Trustee's appraisal of the Southeast Assets.

8.      A final hearing to approve and enter an order confirming the sale of the Assets to the highest and best bidder is scheduled for August 18, 2011, at 3:00 p.m. at the United States

1406
Bankruptcy Court, 51 S.W. First Avenue, Courtroom ~~1404~~, Miami, Florida, 33130 (the *"Final Sale Hearing"*).

9.      Both the Overseas Private Investment Corporation (*"OPIC"*) and the Unsecured Creditors' Committee reserve their right to object to the sale of the Assets at the Final Sale Hearing.

10.     The Court retains jurisdiction over this matter for the entry of such further orders as necessary and appropriate, including, to enforce and interpret the terms of this Order and to resolve any dispute concerning the sale of the Assets, or the rights and duties of the parties with respect to the sale of the Assets.

###

**Submitted By:**
Daniel N. Gonzalez, Esquire
Fla. Bar No. 0592749
dgonzalez@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
*Attorneys for Trustee*
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone:    (305) 358-6363
Telefax:      (305) 358-1221

**Copies Furnished To:**
Daniel N. Gonzalez, Esquire, is directed to serve copies of this Order on all parties in interest and to file a Certificate of Service.

# EXHIBIT "A"

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:

| | |
|---|---|
| INNOVIDA HOLDINGS, LLC, | Case No. 11-17702-RAM |
| et al., | Case No. 11-17704-06-RAM |
| | Chapter 11 |
| Debtors. | Jointly Administered |

_____/

### NOTICE OF BIDDING PROCEDURES FOR SALE OF CERTAIN ASSETS OF INNOVIDA HOLDINGS, LLC; INNOVIDA SERVICES, INC.; INNOVIDA SOUTHEAST, LLC; AND INNOVIDA MRD, LLC

PLEASE TAKE NOTICE THAT on July 29, 2011, the United States Bankruptcy Court for the Southern District of Florida, Judge Robert A. Mark ("Bankruptcy Court"), granted Mark Meland's, as Chapter 11 Trustee (the *"Trustee"*) for InnoVida Holdings, LLC (*"Holdings"*), InnoVida Services, Inc. (*"Services"*), InnoVida Southeast, LLC (*"Southeast"*) and InnoVida MRD, LLC (*"MRD"*)(collectively, Holdings, Services, Southeast, and MRD shall be referred to as the *"Debtors"*), Motion for entry of an Order (i) Approving Transfer of Patent Applications to Innovida, Holdings, LLC; (ii) Authorizing Trustee to Execute the Asset Purchase Agreement attached hereto, and to Sell Assets (the *"Assets"*) Free and Clear of Liens, Claims, and Encumbrances with Valid and Enforceable Encumbrances Attaching to the proceeds of the Sale; (iii) Approving Notice Provisions; (iv) Approving Competitive Bidding Procedures; (v) Scheduling an Auction; and, (vi) Scheduling a Hearing to Approve the Selection of the Highest and Best Offer and Certain Related Relief (the *"Sale Motion"*).

PLEASE TAKE FURTHER NOTICE THAT in granting the Sale Motion, the Bankruptcy Court adopted the procedures set forth in this Notice (the *"Bidding Procedures"*), pursuant to which (a) interested parties will have the opportunity to make competing offers to purchase the Assets, as described below; and (b) the Assets will ultimately be sold to the bidder submitting the highest and best bid at an Auction (as defined in section 6 below)(the *"Sale"*), which highest and best bid must be approved by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE THAT the Trustee and Millport Associates, S.A. (*"Millport"* and/or *"Proposed Buyer"*) have executed that certain Asset Purchase Agreement, dated as of July 21, 2011 (the *"Agreement"*), a true and correct copy of which is attached hereto as Exhibit "A." Pursuant to the terms of the Agreement, the Proposed Buyer has agreed to purchase from the Trustee the certain Assets (as defined in the Agreement) of Holdings, Southeast, MRD, and Services, subject to the Bankruptcy Court approving the selection of the Proposed Buyer as the Successful Bidder (as defined in Section 6 below). The purchase price for

the Assets is $500,000 cash at closing as described in the Agreement (the "Purchase Price").  The Proposed Buyer shall be treated as a Qualified Bidder (as defined in Section 3 below), for all purposes under the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE THAT the Trustee will hold an auction (the "Auction") for the sale of the Assets on August 18, 2011 at 3:00 p.m., at the United States Bankruptcy Court, 51 S.W. First Avenue, Courtroom 1404, Miami, Florida, 33130, to select the highest and best bid to purchase the Assets.

PLEASE TAKE FURTHER NOTICE THAT Judge Robert A. Mark, United States Bankruptcy Court, 51 S.W. 1st Avenue, Miami, FL 33130, Courtroom 1404, will hold a hearing on August 18, 2011 at 3:00 p.m., to approve the Trustee's selection of the highest and best bid to purchase the Assets (the ***"Final Sale Hearing"***).

## BIDDING PROCEDURES

1.      <u>Identification of Potential Bidders.</u>  This Notice of Bidding Procedures is being sent to all persons and entities identified by the Trustee and all other entities or persons having expressed, or otherwise known to have, an interest in acquiring the Assets, and the wherewithal to consummate such a transaction, and to all creditors and equity holders of the Debtors.  Any other person or entity interested in bidding for the Assets may obtain a copy of this Notice of Bidding Procedures, together with all attachments hereto, by requesting such information from the Trustee's counsel: Daniel N. Gonzalez, Esq., Meland Russin & Budwick, P.A., 3000 Southeast Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131; Telephone No. (305) 358-6363, Facsimile No. (305) 358-1221, e-mail dgonzalez@melandrussin.com ("Trustee's Counsel").

2.      <u>Due Diligence.</u>  Upon a request in writing or by e-mail to Trustee's Counsel by any potential bidder, the Trustee will provide to such potential bidder copies or e-mail transmissions, as appropriate, of the Schedules of Assets and Liabilities and Statements of Financial Affairs prepared and filed by the Trustee in these Chapter 11 cases.  Upon receipt by the Trustee's Counsel of evidence reasonably satisfactory to the Trustee that the potential bidder is reasonably likely to be able to consummate the purchase of the Assets, the Trustee shall make all reasonable efforts to provide a potential bidder with such additional information the potential bidder may request that is in the Trustee's possession on or before the deadline to submit a qualified bid, as may reasonably be necessary or relevant to the formulation of its bid.

3.      <u>Qualified Bidders.</u>  No bid for the Assets will be considered unless prior to or in conjunction with making such bid, the bidder (who, after complying with the requirements of this paragraph, shall be a ***"Qualified Bidder"***) delivers the following items to the Trustee, with a copy to Trustee's Counsel:

      a.      a written irrevocable offer for the purchase of the Assets in an amount equal to at least $570,000, and otherwise adopting the same terms as the Agreement, unless otherwise agreed to by the Trustee pursuant to the terms in Section 6 below;

      b.      deliver an earnest money deposit to the Trustee of not less than $150,000 (the "Deposit") in cleared funds (either by cashier's check payable to "Mark Meland, Chapter 11 Trustee" or wire transfer payable to the Trustee's account);

      c.      Competing Bids must not be subject to financing, due diligence, or other contingencies not provided for in the Agreement and must acknowledge that the sale is "as is/where is, with no representations or warranties whatsoever by the Trustee."

      d.      Satisfactory evidence of its financial ability to timely consummate the sale of the Assets on the terms of the Competing Bid.

The items detailed in a-d of Section 3 above shall be defined as the ***"Competing Bid."***

4.      <u>Time for Submission of Competing Bids.</u>  Any Qualified Bidder that desires to make a Competing Bid to purchase the Assets shall deliver a copy of its Competing Bid so that it is received not later than 5:00 p.m. Eastern Daylight Time on August 16, 2011 (the "Bid Deadline") to the following recipients:

      Trustee:      Mark Meland, Chapter 11 Trustee of the Debtors
                  Meland Russin & Budwick, P.A.
                  3000 Southeast Financial Center
                  200 South Biscayne Boulevard
                  Miami, FL 33131-2335
                  Attn: Daniel N. Gonzalez
                  Tel. No.:  (305) 358-6363
                  Fax No.:  (305) 358-1221

      With Copy to:      Meland Russin & Budwick, P.A.
                  3000 Southeast Financial Center
                  200 South Biscayne Boulevard
                  Miami, FL 33131-2335
                  Attn: Daniel N. Gonzalez
                  Tel. No.:  (305) 358-6363
                  Fax No.:  (305) 358-1221

5.      <u>The Auction.</u>  A sale of the Assets shall be by voice auction conducted by Bankruptcy Judge Robert A. Mark (the ***"Auction"***) commencing on August 18, 2011 at 3:00 p.m. at the United States Bankruptcy Court, 51 S.W. First Avenue, Courtroom 1404, Miami, Florida, 33130.  Any Qualified Bidder that has made a Competing Bid consistent with the requirements of Sections 3 and 4 above may participate in the Auction.  Bidding shall proceed in increments of $20,000 or in an amount to be determined by the Trustee at the Auction.

6.      <u>Selection of Successful Bidder.</u>  At the completion of the Auction, the Trustee shall review and consider each of the bids and shall determine which of the bids constitutes the highest and best bid for the Assets (the "Successful Bidder").  The Trustee may consider Competing Bids for less than the entire Assets if the Trustee is (a) satisfied that the value of the Competing Bid plus the value of the Assets excluded from the Sale exceed $570,000, net of any expenses to maintain and later sell the unsold Assets; or (b) is satisfied that acceptance of the Competing Bid is in the best interest of the estate.

7.      <u>Closing.</u>  The Successful Bidder shall close the transaction on August 29, 2011, if there are no objections to the Sale at the Final Sale Hearing.  If there is an objection to the Sale at the Final Sale Hearing, which objection is overruled by the Bankruptcy Court, then the Successful Bidder shall close no later than September 2, 2011 if no appeal from the order approving the Sale is filed; and, if an appeal is filed, then the Successful Bidder shall have the option to close on the Sale or cancel its bid no later than September 2, 2011.  In the event the Successful Bidder closes, or withdraws its bid (in which case the Trustee would return the Successful Bidder's deposit), the Successful Bidder shall be required to pay the Martin Weiss and Margaret Weiss Partnership (the **"Landlord"**) $567.95 for each day in September until the later of the following: removing all the personal property from the Landlord's premises where Innovida Southeast's and Services personal property is housed; or, providing notice to the Trustee that it is withdrawing its bid.  If the Proposed Buyer is the Successful Bidder, the Agreement shall be amended to reflect the results of the bidding.

8.      <u>Back-Up Bidder.</u>  If a Qualified Bidder is determined to be the Successful Bidder but fails to timely close as provided in Section 6 or Section 7, then the second highest Competing Bidder approved by the Court at the Auction (the "Back-Up Bidder") shall be approved as the Successful Bidder without further Court order and shall be subject to Section 7 above.  The Back-Up Bidder shall close the transaction within two (2) calendar days after being advised by the Trustee in writing of the Successful Bidder's failure to close.  If the Proposed Buyer is the Back-Up Bidder, the Agreement shall be amended to reflect the results of the bidding.

9.      <u>Return or Forfeit of Good Faith Deposits.</u>  A Competing Bidder's Good Faith Deposit shall be promptly returned to <u>such</u> bidder if: (i) prior to making a bid, the bidder advises the Trustee's Counsel in writing that it will not make any bid to purchase the Assets; (ii) the bidder is determined not to be a Qualified Bidder; (or (iii) the bidder is a Qualified Bidder (who has not otherwise forfeited its Good Faith Deposit), but is not a Successful Bidder (as defined in Section 6).  However, if such bidder is determined to be the Back-Up Bidder (as defined in Section 8), such bidder shall not be entitled to its deposit until the Successful Bidder has closed on the purchase transaction in accordance with Section 6 and Section 7.  A bidder shall forfeit the Good Faith Deposit if (i) the bidder withdraws or modifies its bid other than as provided herein before the Bankruptcy Court selects the

Successful Bidder (as defined in Section 6); or (ii) the bidder is the Successful Bidder (as defined in Section 6) or Back-Up Bidder (as defined in Section 7) and (A) modifies or withdraws the bid without the Bankruptcy Court's consent before the consummation of the sale contemplated by the Competing Bid; (B) breaches the Competing Bid; or (C) fails or refuses to close the sale contemplated by the Competing Bid within the deadlines set by this Notice.

**DATED** this 1st day of August 2011.

EXHIBIT A

<u>ASSET PURCHASE AGREEMENT</u>

## AS-IS WHERE-IS ASSET PURCHASE AGREEMENT

This As-Is/Where-Is Asset Purchase Agreement (the "Agreement") is made and entered into as of this 21st day of July 2011 by and between Mark S. Meland, solely in his capacity as Chapter 11 Trustee (the "Seller" and/or "Trustee") for the jointly administered estates of InnoVida Holdings, LLC ("Holdings"), InnoVida Services, Inc. ("Services"), InnoVida MRD, LLC ("MRD"), and InnoVida Southeast, LLC ("Southeast") (collectively Holdings, Services, MRD, and Southeast shall be referred to herein as the "Debtors") and as Court-appointed receiver (the "Receiver") for Holdings and its numerous affiliates and subsidiaries in the state court action styled *Chris Korge v. Claudio Osorio, Amarilis Osorio, Craig Toll and Innovida Holdings, LLC*, Case No.: 10-51885-CA-32 ("State Court Action") and Millport Associates, S.A. ("the Buyer"), a Panamanian corporation, whose address is Calle 54, Este, Edificio Arango Orillac, 2do Floor, Panama City, Panama.

W I T N E S S E T H:

WHEREAS, Holdings is the holding company and corporate parent of the other InnoVida entities;

WHEREAS, Services operated a factory to produce fiber composite panels to build structures;

WHEREAS, MRD is the factory workers/production company;

WHEREAS, Southeast is the factory management/production company;

WHEREAS, Holdings is the owner of several assets listed on Exhibit "D" and on Closing Date (as defined in Section 4.1 hereof) will be the owner of numerous patent applications (the "Patent Applications") listed in Exhibit "B";

WHEREAS, on March 24, 2011, Holdings, at the direction of the Trustee, filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), case no: 11-17702-BKC-RAM;

WHEREAS, on March 24, 2011, Services, at the direction of the Trustee, filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court, case no: 11-17705-BKC-RAM;

WHEREAS, on March 24, 2011, MRD, at the direction of the Trustee, filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court, case no: 11-17704-BKC-RAM;

1



WHEREAS, on March 24, 2011, Southeast, at the direction of the Trustee, filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court, case no: 11-17706-BKC-RAM;

WHEREAS, on March 28, 2011, the Chapter 11 bankruptcy cases of Holdings, Services, MRD, and Southeast were jointly administered [ECF No. 23];

WHEREAS, on April 4, 2011, Mr. Meland was appointed Chapter 11 Trustee for the Debtors [ECF No. 55];

WHEREAS, the Debtors' ownership interest in and to the assets being sold herein are based solely on filed tax returns, organizational charts provided by Claudio Osorio, Craig Toll and other former officers of the Debtors, and the Trustee's accountants review and analysis of the available records of the Debtors;

WHEREAS, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, the Buyer desires to purchase and assume from the Trustee, and the Trustee desires to sell, transfer, assign, convey and deliver to the Buyer, the Assets (as defined in Section 1.1 hereof) relating to the Debtors identified herein together with certain obligations as set forth in this Agreement; and

WHEREAS, the Buyer acknowledges that it will serve as a stalking horse bidder for the sale of the Assets listed herein, and that the Buyer's offer will be subject to higher and better offers from qualified bidders.

NOW, THEREFORE, in consideration of the aforesaid Recitals (which are hereby incorporated into and shall be deemed a part of this Agreement), the covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties , it is agreed as follows:

1.    **As-Is/Where-Is Purchase of Assets**

1.1    **Assets**: Subject to the terms and conditions of this Agreement, as of the Closing Date (as defined in Section 4.1 hereof), the Trustee agrees to sell, convey, transfer and deliver to Buyer, and Buyer agrees to purchase, the Assets owned or controlled by any of the Debtors and located in the United States and all intellectual property (including patents, trademarks, patents and/or trademarks applications, and all other intellectual property known or unknown at this time, the "Intellectual Property") owned or controlled directly or indirectly by any of the Debtors regardless of the location, identified on Exhibits "A" – "D" hereto, all in their "as-is/where-is" condition with no representations or warranties whatsoever, except as stated in Section 7 (the "Assets"), and free and clear of any Encumbrances (as defined in Section 1.3.1 hereof) pursuant to Section 363 and 365 of the Bankruptcy Code.

2



1.2    **Instruments of Transfer**:   The sale, assignment, transfer, conveyance and delivery of the Assets and/or assets (as the case may be) to the Buyer shall be made by assignments, bill of sale, and other instruments of assignment, transfer, and conveyance provided for in Section 4 below and such other instruments as may reasonably be requested by the Buyer or the Trustee.  None of the foregoing documents shall increase in any material way the burdens imposed· by this Agreement upon the Trustee, the Receiver or the Buyer, unless they are compulsory to comply and fulfill with the terms and conditions of this Agreement, in which case the parties in good faith will discuss the best practical solution to solve the deadlock.

1.3    **Definitions**

1.3.1   As used herein, the term "Encumbrances" shall mean all mortgages, liens, pledges, security interests, claims, demands, rights, interests, charges, restrictions, options to purchase, encumbrances, debts, commitments, taxes, and all tort or contractual claims, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown of any nature whatsoever, whether in rem or in personam, including, without limitation, any claims predicated upon any theory of Successor Liability (as defined in Section 3.2) or any similar theory (collectively, the "Encumbrances").

1.4    **Additional assets and interests**:  In addition to the Assets being sold, the Trustee or the Receiver hereby gives the Buyer an option (the "Option"), exercisable anytime upon written notice within 12 months of the Closing Date, to acquire without additional consideration any assets or interests, in their "as-is" and "where-is" condition, owned or controlled directly or indirectly by any of the Debtors. Upon receipt of notice of exercise, the Trustee or the Receiver shall use his best efforts to transfer title to any assets or interests, in their "as-is" and "where-is" condition, identified by Buyer.

1.5    **Excluded Assets**:  Not included in the Assets and/or assets (as the case may be) are any cash, cash equivalents, rights to receive money or monies, insurance claims, causes of action, or  any interest in Innovida Middle East (except for any Intellectual Property owned or claimed by Innovida Middle East) (the "Excluded Assets").  Included in the Assets and/or assets (as the case may be) for purposes of the Option shall only be Intellectual Property rights in general, existing or claimed, and/or the interests of the Debtors of any operating or formerly operating subsidiary or joint venture of the Debtors, including existing licenses and rights to do business in the respective countries (to the extent such licenses or rights exist) in which such entities operated or formerly operated, but in no event shall include the Excluded Assets.

2.    **Consideration**

3



### 2.1    Purchase Price

2.1.1    The cash consideration to be paid by the Buyer to the Trustee for the Assets shall be **FIVE HUNDRED THOUSAND DOLLARS AND NO/100 DOLLARS ($500,000.00)** (the "Purchase Price"). $136,382.00 of the Purchase Price is allocated to the assets of Southeast that are being sold pursuant to this Agreement and which are identified on Exhibit "A." $20,000.00 of the Purchase Price is allocated to the Patent Applications of Holdings that are being sold pursuant to this Agreement and which are identified on Exhibit "B." $8,540.00 of the Purchase Price is allocated to the sale of the assets of Services that are being sold pursuant to this Agreement and which are identified on Exhibit "C." $285,078.00 of the Purchase Price is allocated to the assets of Holdings (other than the Patent Applications listed on Exhibit "B") and MRD (to the extent there are any) that are being sold pursuant to this Agreement and which are identified on Exhibit "D." And, $50,000.00 of the Purchase Price is allocated as consideration for the Option.

2.1.2    On the Closing Date (as defined in Section 4.1 hereof), the Buyer shall pay and deliver to the Trustee, by wire transfer or cleared funds, the Purchase Price.

### 3.    Liabilities

3.1    This Agreement contemplates the sale, transfer, and assignment of allegedly encumbered Assets, and is contingent on the sale of such allegedly encumbered Assets via an order of the Bankruptcy Court and State Court allowing for such sale, transfer, and assignment free and clear of Encumbrances. This Agreement does not contemplate the sale, transfer, and assignment of any of the Assets or other assets (located within the territory or under the jurisdiction of the Courts of the United States) that have not been freed and cleared of Encumbrances by order of the Bankruptcy Court and State Court nor of any personal property leases, real property leases, or executory contracts of the Debtors to the Buyer. However, to the extent the Buyer wishes to negotiate with any lessor to assume such liabilities, the Buyer may do so directly. In the event the Buyer does negotiate any agreements with any lessors of the Debtors, the Buyer shall be solely responsible for any amounts due, past due or penalties associated with past due amounts with respect to any leases (either personal or real) or executory contracts and the amounts necessary to satisfy any such secured creditor. The Trustee reserves the right to abandon any assets subject to liens, claims or encumbrances and reject any executory contracts in his sole and absolute discretion.

3.1.1 – To the best of Trustees' actual knowledge, this Agreement does not contemplate the sale, transfer, and assignment of any of the Assets or other assets (located outside the territory or not under the jurisdiction of the Courts of the United States) that have not been freed and cleared of Encumbrances on the date of their sale, transfer or assignment to the Buyer. The Trustee shall disclose to the Buyer immediately after he becomes aware of any Encumbrance which may affect any of the Assets or other assets (located outside the territory or not under the jurisdiction of the Courts of the United States) from the date hereof to the date of the expiration of the Option period.

4



3.2    For purposes of this Agreement, the term "Liability" or "Liabilities" shall include, without limitation, any direct or indirect indebtedness, guaranty, endorsement, claim (including, without limitation, "claim" as defined in Section 101(5) of the Bankruptcy Code), loss, damage, deficiency, cost, expense, obligation, or responsibility, fixed or unfixed, known or unknown, asserted or unasserted, choate or inchoate, liquidated or unliquidated, secured or unsecured, matured or unmatured, absolute or contingent, whether arising under contract, tort, or by statute. Without limiting the breadth and generality of the foregoing, the Buyer shall not assume or incur any Liability in respect to any of the following:

3.2.1    Liabilities to any of the Debtors' creditors for deficiencies following the sale, return, or other disposition of any assets or Assets, which are subject to their respective security interests except as otherwise provided in Section 3.1 above;

3.2.2    Any Liabilities of the Debtors arising out of any product liability, premises liability, or similar claim for injury to person or property, regardless of when made or asserted, which arises out of or is based upon any expressed or implied representation, warranty, agreement, or guaranty made by the Debtors, or alleged to have been made by the Debtors, or which is imposed or asserted to be imposed by operation of law, and any claim seeking recovery for consequential damage, lost revenue, or income;

3.2.3    Any Liabilities of the Debtors, arising out of any foreign, federal, state, or local taxes, including excise and sales taxes, or payphone service charges payable with respect to the Assets;

3.2.4    Any Liability arising or accruing on or prior to the Closing to any employees, agents, or independent contractors of the Debtors, whether or not employed by the Buyer after the Closing, or under any benefit arrangement with respect thereto;

3.2.5    Any Liability of the Debtors or the Trustee arising or incurred in connection with the negotiation, preparation, and execution of this Agreement and the transactions contemplated hereby, including, fees and expenses of counsel, accountants, and other experts;

3.2.6    Any Liability arising with respect to any successor or alter ego Liability of the Debtors under any legal, statutory, contract, tort or equitable theory (collectively, "Successor Liability"); and

3.2.7    Any other Liability of the Debtors



4.    **Closing Transactions**

    4.1    **Closing:**  The closing of the transactions provided for herein (the "Closing") shall take place at the offices of Meland Russin & Budwick, P.A., 200 South Biscayne Blvd, Suite 3000, Miami, Florida 33131, on the fifth day after the entry of the Final Sale Order (as defined in Section 9.2.2 hereof) (hereinafter defined), or after the time to appeal has expired, whichever is later (the "Closing Date"). On the Closing Date, the Buyer shall remove all of the Assets from Holdings warehouse located at 470 NE 185th Street, Miami, Florida 33179.

    4.2    **Alternative Closing Date:**  The parties may mutually agree in writing to an extended Closing Date and shall diligently endeavor to satisfy all conditions to the Closing.

    4.3    **The Trustee's (or Receiver's) Deliveries to the Buyer at the Closing:**  On or before the Closing Date, the Trustee shall make the following deliveries to the Buyer:

        4.3.1    Right to possession of the Assets shall be transferred to the Buyer on the Closing Date and immediately upon Closing. The Trustee or the Receiver, as the case may be, shall deliver to the Buyer on the Closing Date such keys, lock and safe combinations, location lists of Assets, and other similar items as the Buyer shall require to obtain immediate control of the Assets and shall also make available to the Buyer the originals of all documents in the Trustee's or the Receiver's possession that are required to be transferred to the Buyer by this Agreement;

        4.3.2    A bill of sale, duly executed by the Trustee, in the form and on the terms of the bill of sale attached hereto as Exhibit "E," pursuant to which the Trustee transfers the Assets (the "Bill of Sale");

        4.3.3    A Final Sale Order entered by the Bankruptcy Court in the Bankruptcy Case and a final and nonappealable order in the State Court Action in the form reasonably acceptable to the Trustee and the Buyer approving the sale of the Assets to the Buyer, which order shall not have been stayed by any court of competent jurisdiction;  and

        4.3.4  All documents in the Trustee's possession related to the transferring of the title of the filings and/or the Patent Applications to the Buyer required by the respective official Patent Office (WIPO, USPTO or the European Patent Office, as the case may be, in accordance with Exhibit B).

    4.4    **Buyer's Deliveries to the Trustee at the Closing:**  On the Closing Date, the Buyer shall make or cause the following deliveries to the Trustee:

        4.4.1    The Purchase Price to be delivered by the Buyer and the Escrow Agent (as defined in Section 9.1 below) directly to the Trustee at the Closing under Section 2.1 and 9.1 hereof.

6



4.5    **Sales, Use, and Other Taxes**: Any sales, purchases, transfer, stamp, documentary stamp, use, or similar taxes which may be payable by reason of the sale or transfer of the Assets and/or assets (as the case may be) under this Agreement or the transactions contemplated herein shall be borne and timely paid by the Buyer.

4.6    **Transfer Tax**: The Buyer shall be responsible for any and all excise, sales, value added, use, registration, stamp, franchise, property transfer, gains, transfer and similar taxes, levies, charges and fees (including all real estate transfer taxes if any) incurred in connection with the transactions contemplated by this Agreement. The Buyer and Trustee agree to cooperate in the filing of all necessary documents and tax returns with respect to all such taxes, including, without limitation, any pre-sale filing requirement. The Buyer shall pay such taxes to the Trustee at Closing.

5.    **Conditions Precedent to the Closing**

5.1    **Conditions to the Trustee's Obligations**: The Trustee's obligation to make the deliveries required of the Trustee at the Closing Date shall be subject to the satisfaction or waiver by the Trustee of each of the following conditions.

5.1.1    All of the representations and warranties of the Buyer contained herein shall continue to be true and correct at the Closing in all material respects, all covenants and obligations to be performed by the Buyer prior to the Closing shall have been performed in all material respects, and the Buyer shall have certified the foregoing to the Trustee in writing.

5.1.2    The Buyer shall have executed and delivered to the Trustee each document reasonably requested by the Trustee as contemplated herein.

5.1.3    The Trustee shall have received the Purchase Price, less the Deposit (as defined herein), in immediately available funds.

5.1.4    The Buyer shall have delivered to the Trustee appropriate evidence of all necessary corporate action by the Buyer in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by the Buyer's directors approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by the Buyer of this Agreement; and (ii) a certificate as to the incumbency of officers of the Buyer executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

5.1.5    No order enjoining or restraining the Closing shall have been issued by a court of competent jurisdiction.

5.1.6    The Bankruptcy Court shall have entered the Sale Procedure Order in accordance with Section 9.2.1 below and the Final Sale Order, both of which shall be on terms and conditions reasonably acceptable to the Trustee, and the Final Sale Order shall not have been stayed as of the Closing Date.

7



5.2 **Conditions to the Buyer's Obligations**: The Buyer's obligation to make the deliveries required of the Buyer at the Closing shall be subject to the satisfaction or waiver by the Buyer of each of the following conditions:

5.2.1 The representations and warranties of the Trustee set forth herein shall be true and correct at the Closing Date in all material respects and all covenants and obligations to be performed by the Trustee prior to the Closing Date shall have been performed in all material respects, and the Trustee shall have certified the foregoing to the Buyer in writing.

5.2.2 The Trustee shall have executed and delivered to the Buyer any required assignment agreement, the Bill of Sale, and each other document reasonably requested by the Buyer.

5.2.3 No order enjoining or restraining the Closing shall have been issued by a court of competent jurisdiction.

5.2.4 The Bankruptcy Court shall have entered the Sale Procedure Order in accordance with Section 9.2.1 below and issued the Final Sale Order, both of which shall be on terms and conditions reasonably acceptable to the Buyer. The Final Sale Order shall not have been stayed as of the Closing Date. If an appeal of the Final Sale Order has been taken, Buyer may opt to withdraw from this Agreement and receive return of its Deposit (defined in Section 9.1 hereof).

5.2.5 The order in the State Court Action transferring the Patent Applications from the relevant Innovida affiliate or subsidiary to Holdings shall not have been stayed and will be final and non-appealable as of the Closing Date.

5.2.6 Delivery of title to all the Assets, free and clear of all liens, claims and Encumbrances of any nature pursuant to 11 U.S.C. § 363 of the Bankruptcy Code.

6. **Termination**: If any of the above conditions is neither satisfied nor waived on or before the date by which the condition is required to be satisfied, the party affected thereby may terminate this Agreement by delivering to the other written notice of termination. Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving party; provided, however, that the consent of a party to the Closing shall constitute a waiver by such party of any conditions to Closing not satisfied as of the Closing Date.

7. **The Trustee's Representations and Warranties**: The Trustee hereby makes the following representations and warranties to the Buyer, which representations shall be true and correct as of the date hereof and as of the Closing Date for all purposes:

7.1 **Title to Property**: At the Closing (after Bankruptcy Court Approval and the State Court Approval), the Buyer will acquire and have title in and to all of the Assets, free and clear of any Encumbrances, as provided by the Final Sale Order with any such Encumbrances to attach to the proceeds of sale under this Agreement, and in accordance to the terms of Section 3.1 and 3.1.1 (as the case may be).

8



7.2    **Validity of Agreement**:  Subject to the Final Sale Order, the execution, delivery, and performance of this Agreement has been duly authorized by the Trustee and the Receiver, and this Agreement is a valid and binding obligation of the Trustee and of the Receiver, enforceable in accordance with its terms.

7.3    **Organization, Standing and Power**:  The Debtors are Florida corporations, duly organized, validly existing and in good standing under the laws of the State of Florida. Subject to the applicable provisions of Bankruptcy Code and the Final Sale Order, the Trustee, solely in his capacity as Chapter 11 Trustee for the jointly administered estates of the Debtors, and as a Receiver in the State Court Action, pursuant to applicable Federal and State Court orders, and to the best of his knowledge, has all requisite corporate power and authority to execute, deliver, and perform this Agreement and all writings relating hereto.

7.4    **No Conflicts or Violations**:  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by the Trustee or the Receiver do not and will not, with regard to the Debtors: (i) violate any statute, law, rule, or regulation, or any order, writ, injunction, or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument, or writing of any nature to which the Trustee (or the Receiver) is a party or is formally aware of in such capacity of Trustee (or Receiver); or to the best of the Trustee's or the Receiver's knowledge, (iii) violate or conflict with or constitute a default under any agreement, instrument, or writing of any nature to which the Debtors are a party or by which the Debtors or their assets or properties may be bound which prevents or would prevent this transaction to be concluded in part or in its entirety with due fulfillment of and compliance with the terms and conditions of this Agreement.

7.5    **No Conflicts or Violations**:  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by the Trustee or the Receiver do not and will not, with regard to the affiliates and subsidiaries of the Debtors, to the best of the Trustee's or the Receiver's knowledge: (i) violate any statute, law, rule, or regulation, or any order, writ, injunction, or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument, or writing of any nature to which the Trustee (or the Receiver) is a party or is formally aware of in such capacity of Trustee (or Receiver); or (iii) violate or conflict with or constitute a default under any agreement, instrument, or writing of any nature to which the affiliates or subsidiaries of the Debtors are a party or by which the affiliates or subsidiaries of the Debtors or their assets or properties may be bound which prevents or would prevent this transaction to be concluded in part or in its entirety with due fulfillment of and compliance with the terms and conditions of this Agreement.

8.    **The Buyer's Representations and Warranties**:  The Buyer hereby makes the following representations and warranties to the Trustee:

9



8.1    **Validity of Agreement**:  All action on the part of the Buyer necessary for the authorization, execution, delivery, and performance of this Agreement by the Buyer, including, but not limited to, the performance of the Buyer's obligations hereunder, has been duly taken. This Agreement, when executed and delivered by the Buyer, shall constitute the valid and binding obligation of the Buyer enforceable in accordance with its terms.

8.2    **Organization, Standing, and Power**:  The Buyer is duly organized, valid, existing, and in good standing under the laws of the Panama.  The Buyer has all requisite corporate power and authority to own, lease, and operate its properties, to carry on its business as now being conducted, and to execute, deliver, and perform this Agreement and all writings relating hereto.

8.3    **No Conflicts or Violations**:  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by the Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of the Buyer; (ii) violate any statute, law, rule, or regulation, or any order, writ, injunction, or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument, or writing of any nature to which the Buyer is a party or by which the Buyer or its assets or properties may be bound.

8.4    **Financing**:  The Buyer has sufficient funds available to consummate the transactions contemplated hereby.

8.5    **"As-Is/Where-Is" Transaction**:  Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, the Trustee makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets including, without limitation, income to be derived or expenses to be incurred in connection with the Assets, the physical condition or location of any personal property comprising a part of the Assets, the value of the Assets (or any portion thereof), the merchantability or fitness of the personal property or any other portion of the Assets for any particular purpose, or any other matter or thing relating to the Assets or any portion thereof.  Without in any way limiting the foregoing, Trustee hereby disclaims any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Assets.  Buyer further acknowledges that Buyer has conducted an independent inspection and investigation as to the physical condition of the Assets and all such other matters relating to or affecting the Assets as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Assets, except for any representations and warranties expressly set forth in Section 7, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, subject to the representations and warranties of the Trustee set forth in Sections 7, the Buyer will accept the Assets at the Closing "as is", "where is" and "with all faults."

10



9.      **Conduct and Transaction Prior to the Closing**

9.1     Deposit: Buyer shall pay a deposit of **FIFTY THOUSAND DOLLARS AND NO/100 in cleared funds** (the "Deposit") to the Trustee (the "Escrow Agent") upon execution of this Agreement, which Deposit shall be held in a non-interest bearing trust account. If the Closing does not occur, then, the Deposit shall become nonrefundable and shall be delivered to the Trustee if and only if (i) Trustee has satisfied each of Buyer's conditions set forth in Sections 4.3.1, 4.3.2, 4.3.3 and 4.3.4 and (ii) a Buyer's Default (hereinafter defined) has occurred and continues to exist as of the Closing Date. As used herein, the term "Buyer's Default" shall mean either (i) the failure of Buyer to close the transaction contemplated by this Agreement on the Closing Date or (ii) the failure of Buyer to satisfy each of the conditions to Trustee's obligation to close set forth in Section 5.1.1, 5.1.2, 5.1.3 and 5.1.4 on the Closing Date. The Escrow Agent shall return to the Buyer the Deposit if any of the following events occur: if this Agreement is terminated in accordance with the terms of this Agreement by either party (except as a result of Buyer's default) or if the Closing fails to occur (i) because each of the conditions to Buyer's obligation to close set forth in Sections 5.2.1, 5.2.2, 5.2.3, 5.2.4,5.2.5 and 5.2.6 is not satisfied as of the Closing Date, or (ii) because Trustee fails to close the transactions contemplated under this Agreement on the Closing Date, or (iii) because the Closing Date has not yet occurred within 60 (sixty) days (the "Expiration Date") after the date of execution of this Agreement (the date of such mutual execution and delivery of this Agreement is sometimes referred to herein as the "Execution Date"), for any reason other than a Buyer's Default and unless the Buyer and the Trustee formally accepts to extend such deadline for an additional period until 15 days before the Expiration Date. In addition, the Escrow Agent shall return the Deposit to the Buyer upon written request if any material changes, in the exclusive opinion of the Buyer, are made to this Agreement prior to Bankruptcy Court approval that are not acceptable to the Buyer.

9.2     **Bankruptcy Court Approvals:**

9.2.1   **Bankruptcy Court Approval of Sale Procedures**: On the Execution Date, the Trustee will file an emergency motion for entry of an order authorizing the Trustee to execute the Agreement, approving notice provisions, approving competitive bidding procedures, scheduling an auction, and scheduling a hearing to approve the Sale of the Assets (the "Sale Procedure Motion"), and through which Sale Procedure Motion the Trustee will request the entry of an order (the "Sale Procedure Order") approving the following:

(a) setting an expedited hearing on the Sale Procedure Motion;

(b) requesting the Bankruptcy Court to fix the time, date, and location of an auction (the "Auction") and final hearing (the "Approval Hearing") to approve the Trustee's sale of the Assets via public auction (to the extent a qualified bid is presented);

11



(c) approving the following minimum bid procedures (the "Bid Procedures"): bids shall be pre-qualified by depositing with the Trustee simultaneously with the submission of such bid ONE HUNDRED FIFTY THOUSAND DOLLARS AND NO/100 in cleared funds; the potential bidder shall have presented to the Trustee an executed asset purchase agreement in the same form as this Agreement that provides for a purchase price of at least FIVE HUNDRED SEVENTY THOUSAND DOLLARS AND NO/100 by 5:00 pm two business days before the Auction; the minimum overbid at the Auction for the sale of Assets shall be TWENTY THOUSAND DOLLARS AND NO/100 DOLLARS; and, if the Trustee receives a qualified bid from a third party, the Trustee shall provide a copy of such bid to the Buyer within 24 hours of the receipt of such bid; and

(d) approving a $60,000 break-up fee (the "Break-Up Fee") to the Buyer in the event the Buyer is not the successful bidder at the Auction for Assets.

9.2.2. **Bankruptcy Court's Approval of Sale**: The order approving the sale of the Assets (the "Final Sale Order") shall provide the following, unless specifically waived by the Buyer:

(a) Make a finding that matters subject to this Agreement are "core" matters over which the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. Sections 1334 and 157;

(b) Make a finding that due and proper notice of the transactions contemplated by this Agreement and ancillary agreements has been given to creditors, shareholders, potential claimants, and other parties in interest;

(c) Make a finding that the Purchase Price constitutes fair value for the Assets;

(d) Make a finding that the Assets are being purchased by the Buyer in good faith and that the Purchase Price was not controlled by an agreement among potential bidders and otherwise complies with the requirements of Section 363(m) of the Bankruptcy Code;

(e) Make a finding that "sound business reasons" exist for Bankruptcy Court approval of this Agreement;

(f) Except as otherwise provided in this Agreement, approve the Agreement and provide that the Assets are to be conveyed to the Buyer free and clear of all Encumbrances;

(g) Except as otherwise provided in this Agreement, provide that the Buyer shall not be liable or obligated for any Liability (including Successor Liability), liens, interests, damages, costs, expenses, claims, or demands arising from or relating to the Debtors ownership or operation of the Assets or the Debtors conduct of the business related to the Assets on or prior to the Closing Date;

12



(h)     Specifically overrule objections, if any, to the sale; provided, however, that the Final Sale Order shall not have been stayed, materially modified, withdrawn, or reversed as of the Closing;

(i)     Approve the Bill of Sale;

(j)     Copies of the Sale Procedure Order and the Final Sale Order shall be served on all creditors and interested parties, including but not limited to, all past and present employees and all necessary taxing and regulatory authorities; and

(k)     The terms and provisions of the Agreement, together with the terms and provisions of the Final Sale Order shall be binding in all respects on any trustee appointed in the Trustee's Chapter 11 Bankruptcy Case, or if the Bankruptcy Case is converted to a Chapter 7 proceeding, on any trustee appointed in a Chapter 7 proceeding.

Following the filing of the Sale Procedures Motion, the Trustee shall use reasonable efforts to obtain entry of the Final Sale Order. Both the Buyer's and the Trustee's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Procedure Order and the Final Sale Order.

10.    **Miscellaneous**

10.1    **Reasonable Access to Records and Certain Personnel**:  So long as the Bankruptcy Case is pending, (i) the Trustee shall permit the Buyer's counsel and other professionals employed in the Bankruptcy Case reasonable access to the financial and other books and records relating to the Assets (whether in documentary or data form) for the purpose of monitoring the status of the Assets, which access shall include (a) the right of such professionals to copy, at the Buyer's expense, such documents and records as they may request in furtherance of the purposes described above, and (ii) the Trustee shall provide the Buyer and such professionals (at no cost to the Buyer) with reasonable access to such personnel employed, if any, by the Debtors during regular business hours to assist the Buyer in the monitoring of the Assets, provided that such access does not unreasonably interfere with the Debtors' business operations. In addition, Buyer will permit the Trustee access to such records on a post-closing basis as may be reasonably requested by the Trustee for winding up the Debtors' books and affairs, and for administering the Bankruptcy Case, subject to all applicable privacy laws, and the Buyer shall be required to retain the records it receives from the Trustee for a period of five (5) years from the Closing Date.

10.2    **Notices**:  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing or by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date of mailing or date received if by hand-delivery. Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in accordance with this paragraph.

13



| To the Trustee: | Mark A. Meland, Chapter 11 Trustee<br>3000 Wachovia Financial Center<br>200 South Biscayne Blvd.- Miami, FL 33131<br>Tel: (305) 358-6363<br>Email: mmeland@melandrussin.com |
|---|---|
| With a copy to: | Meland, Russin & Budwick, P.A.<br>3000 Wachovia Financial Center<br>200 South Biscayne Blvd. - Miami, FL 33131<br>Attn.: Michael Budwick, Esq.<br>Tel: (305) 358-6363<br>Fax: (305) 358-1221<br>Email: mbudwick@melandrussin.com |
| To the Buyer: | Millport Associates S.A.<br>Calle 54, Este, Edificio Arango Orillac, 2do Floor<br>Panama City, Republic of Panama |

With a copy to:

C.T.N.I. - Centro de Tecnologia, Novos Negócios e Controle das Empresas
IESA/INEPAR - Florianópolis
Rodovia Jose Carlos Daux,  600 (SC 401) - Modulo IESA Bairro João Paulo
Condomínio Tecnológico - ParqTecAlfa
88030-909  Florianópolis, SC Brasil


    10.3    **Entire Agreement**: This instrument and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Assets.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the party to be charged.

    10.4    **Modification**:  This Agreement may be modified, amended, or supplemented only by a written instrument duly executed by all the parties hereto.

    10.5    **Closing Date:** All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document, or transaction shall be deemed to have been taken, delivered, or effected until all such actions, documents, and transactions have been taken, delivered, or effected.

14



10.6    **Severability**:  Should any term, provision, or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive except that, if the Buyer cannot acquire and the Trustee cannot sell substantially all of the Assets, either party may terminate this Agreement, and it shall be of no further force and effect, unless both parties agree in writing to the contrary.

10.7    **Captions:**    All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.8    **Further Assurances:**  Each party hereto will execute, acknowledge, and deliver any further assurance, documents, and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the parties with respect thereto.

10.9    **Waiver:**  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

10.10  **Payment of Fees and Expenses**:  Each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation, and consummation of the Agreement and the transaction described herein.

10.11  **Survival:**  None of the respective representations, warranties, covenants, and agreements of the Trustee and the Buyer herein, including without limitation Section 6 hereof, or in any certificates or other documents delivered prior to or at the Closing, shall survive the Closing unless stated otherwise in this Agreement.

10.12  **Assignments:**  This Agreement shall not be assigned by the Trustee without the prior written consent of the Buyer. This Agreement shall be freely assignable by the Buyer, without approval or consent of the Trustee, so long as the Buyer remains liable for performance in the event of default in performance by the Buyer's assignee.

10.13  **Binding Effect:**  Subject to the provisions of Section 9.2 above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties hereto.

10.14  **Applicable Law:**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of Florida.

15



10.15  **Good Faith**:  All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after the Closing.

10.16  **Construction**:  In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect extensive negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either party hereto.

10.17  **Counterparts**:  This Agreement may be signed in counterparts. The parties further agree that this Agreement may be executed by the exchange of facsimile signature pages.

10.18  **Time is of the Essence:**  Time is of the essence in this Agreement, and all of the terms, covenants, and conditions hereof.

10.19  **Bankruptcy Court Jurisdiction:**  THE BUYER AND THE TRUSTEE AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO: (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PROPERTY AND/OR ASSUMED LIABILITIES, AND THE BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

10.20  **Waiver of Jury Trial**: THE BUYER AND THE TRUSTEE KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED ON THIS AGREEMENT, AND ANY DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY WITH RESPECT TO THE PURCHASED ASSETS.

10.21  **Attorneys Fees**:  In the event that either party hereto brings an action or other proceeding to enforce or to interpret the terms and provisions of this Agreement, the prevailing party in that action shall be entitled to have and recover from the non-prevailing party all such fees, costs, and expenses, including, without limitation, all court costs and reasonable attorneys' fees, as the prevailing party may suffer or incur in pursuit or defense of such action.

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

16



IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

Innovida Holdings, LLC
Debtor-in-Possession

By: _____
Mark S. Meland, Chapter 11 Trustee

Innovida Southeast, LLC
Debtor-in-Possession

By: _____
Mark S. Meland, Chapter 11 Trustee

Innovida Services, Inc.
Debtor-in-Possession

By: _____
Mark S. Meland, Chapter 11 Trustee

InnoVida MRD, LLC
Debtor-in-Possession

By: _____
Mark S. Meland, Chapter 11 Trustee

Innovida Factories, Ltd.

By: _____
Mark S. Meland, Receiver

BUYER

Millport Associates S/A

By: _____
_____, _____

SIGNATURE PAGE:

Innovida Holdings, LLC
Debtor-in-Possession

By: _____
        Mark S. Meland, Chapter 11 Trustee

Innovida Southeast, LLC
Debtor-in-Possession

By: _____
        Mark S. Meland, Chapter 11 Trustee

Innovida Services, Inc.
Debtor-in-Possession

By: _____
        Mark S. Meland, Chapter 11 Trustee

InnoVida MRD, LLC
Debtor-in-Possession

By: _____
        Mark S. Meland, Chapter 11 Trustee

Innovida Factories, Ltd.

By: _____
        Mark S. Meland, Receiver

BUYER

Millport Associates S.A.

By: _____
    Jaunaval de Oms, Director - Presidente

By: _____
    Di Marco Pozzo, Director - Secretario

17

## Index of Exhibits

A.    Assets to be Sold of Innovida Southeast, LLC
B.    Patent Applications to be Sold of Innovida Holdings, LLC
C.    Assets to be Sold of Innovida Services, Inc.
D.    Assets to be Sold of Innovida Holdings, LLC and Innovida MRD, LLC
E.    Bill of Sale

18



# **EXHIBIT A**

19

3498 - Innovida                          **Exhibit A**

| | | |
|---|---|---|
| **Innovida South East** | | |
| **470 NE 185 Street** | | |
| **North Miami Beach, FL** | | |
| *June 7, 2011* | | |

| Item | Qty | Description |
|---|---|---|
| | | **Reception Area** |
| 1 | 2 | Black Velour Reception Chairs (worn) |
| 2 | 1 | Black Wood Coffee Table |
| 3 | 1 | Artificial Orchid in pot |
| 4 | 1 | Client Chair |
| 5 | 1 | Grey Formica Desk - 3 drawers each side |
| 6 | 1 | Global Black 2 Drawer File Cabinet |
| 7 | 1 | Ativa Model DQ12QDN 12 Sheet Shredder |
| 8 | Lot | Office Supplies in closet and on all desks in office - including file folders, calculators, cd's, rubber bands, trays, paper, etc. |
| 9 | 1 | Black Wood Credenza - 64" |
| 10 | 1 | Black Display/ Nic Nac Table |
| 11 | 1 | Blue/Black & Grey Secretary Chair |
| 12 | 1 | Herman Miller Style Black Mesh Chair |
| 13 | 1 | Decorative Black Vase |
| | | **Office 1 - (left of reception area)** |
| 14 | 1 | Grey Formica Desk - 3 drawers each side |
| 15 | 1 | 6' Black Metal Cabinet converted to shelf unit |
| 16 | 2 | Global Black 2 Drawer File Cabinet |
| 17 | 1 | Black Client Chair |
| 18 | 1 | Blue/Black & Grey Secretary Chair |
| 19 | 1 | 4' x 6' Dry Erase Board |
| 20 | 1 | Holmes Personal Fan |
| | | **Office 2 - (continuing left of reception area)** |
| 21 | 1 | Grey Oval Formica Work Table |
| 22 | 4 | Blue/Black & Grey Secretary Chairs |
| 23 | 2 | Black High Back Client Chairs |
| 24 | 1 | Black Executive Chair with Cover |
| 25 | 1 | Herman Miller Style Black Mesh Chair |
| 26 | 1 | LG 42" TV - Model 42LG70 - Serial #705MXVW18255 |
| 27 | 1 | Black 4 Drawer Horn File Cabinet |
| 28 | 1 | Black 2 Drawer File Cabinet |
| 29 | 1 | Holmes Personal Fan |
| 30 | Lot | Sample Materials / Large Trophy |
| | | **Office 3 - (continuing left of reception area)** |
| 31 | 1 | Grey Formica Desk - 3 drawers each side |
| 32 | 2 | Black Client Chairs |
| 33 | 1 | Blue/Black & Grey Secretary Chair |
| 34 | 1 | Black Metal Storage Shelf |
| 35 | 1 | APC 1500 UPS |
| 36 | 1 | 4' x 3' Dry Erase Board |
| 37 | 1 | 8 Port Comp USA Switch |
| 38 | 1 | Q-See 4 Channel H.264 Security DVR with Camera - Comp USA - (New in Box) |
| | | **Common Area - Next to Reception** |

Moecker Auctions, Inc.

3498 - Innovida                              **Exhibit A**

| Item | Qty | Description |
|------|-----|-------------|
|      |     |             |
| 39 | 1 | Light Wood Conference Table - 95" x 43" |
| 40 | 5 | Client Chairs |
| 41 | 1 | Formica Grey and Black Credenza |
| 42 | 1 | Uniden Phone with extra Set - Powermate 5.8 Gigahertz |
| 43 | 1 | Pelouze Dymo Digital Scale - 5 lb. capacity |
| 46 | 1 | 1 1/2" x 2' Cork Board |
|    |   | **Office 4 - (left of reception area)** |
| 47 | 1 | L Shaped Light Wood Desk |
| 48 | 1 | Round Light Wood Conference Table |
| 49 | 3 | Blue/Black & Grey Secretary Chairs |
| 50 | 1 | Herman Miller Style Black Mesh Chair |
| 51 | 1 | Black Executive Chair with Cover |
| 52 | 1 | Rolling 3 Drawer File, light wood with combo lock |
| 53 | 1 | Black 6' Storage Cabinet with contents |
| 54 | 1 | 4' x 6' Dry Erase Board |
| 55 | 1 | 5' Light Wood Credenza |
|    |   | **Office 5 - (left of reception area)** |
| 56 | 1 | L Shaped Formica Desk |
| 57 | 2 | Black Client Chairs |
| 58 | 1 | Black Hon 4 Drawer File Cabinet |
| 59 | 1 | 4 Drawer Black Lateral File |
| 60 | 1 | Blue/Black & Grey Secretary Chair |
| 61 | 1 | 4' x 6' Dry Erase Board |
| 62 | 1 | Artificial Floral Arrangment |
|    |   | **Conference Room** |
| 63 | 10 | Black Executive Chairs with Covers |
| 64 | 1 | 4' x 10' Wood Conference Table |
| 65 | 1 | Light Wood Credenza 68" |
| 66 | 1 | Black Wood Credenza with Glass Doors - 76" |
| 67 | 1 | 8' Potted Palm in Decorative Pot |
| 68 | 1 | LG 47" TV - Model 47LC7DF - Serial #802MSXK3Y294 |
| 69 | 2 | Black Client Chairs |
| 70 | 1 | 4' x 6' Dry Erase Board |
|    |   | **Offices Adjacent to Conference Room** |
|    |   | **Closet** |
| 71 | 3 | Folding Chairs |
| 72 | 1 | 6' Storage Rack |
| 73 | 2 | Eithernet Netopia Switches |
| 74 | 1 | Dlink DSS-8+ Switch |
| 75 | 1 | Tempo-200 EP Inductive Amplifier |
| 76 | Lot | Assorted Wires and Cables |
| 77 | 1 | Lucent Phone Set 8405D+ |
| 78 | 1 | Lexmark Optra Printer E312L Printer |
| 79 | 2 | APC 1500 Smart UPS |
| 80 | 1 | Projection Screen in case |
|    |   | **Office 6** |
| 81 | 1 | U Shaped Office Partition with two Overhead Cabinets - 8' x 9' x 9' |
| 82 | 2 | Client Chairs |
| 83 | 1 | Blue/Black & Grey Secretary Chair |

Moecker Auctions, Inc.

3498 - Innovida                    **Exhibit A**

| Item | Qty | Description |
|------|-----|-------------|
| | | |
| | | |
| 85 | 1 | HP PRoCurve Switch 4000m A-I |
| 86 | 1 | Cork Board 3' x 2' New |
| | | **Office 7** |
| 87 | 1 | Blue/Black & Grey Secretary Chair |
| 88 | 1 | Black Exec Chair with Cover |
| 89 | 1 | Site Plan Cabinet - 3' x 4' x 3' |
| 90 | 2 | Grey Formica Desk - 3 drawers each side |
| 91 | 1 | 6' Metal Shelf Storage |
| 92 | 1 | 6' Black Storage Cabinet |
| 93 | Lot | Samples and assorted materials |
| 94 | 1 | Herman Miller Style Black Mesh Chair |
| | | **Office 8 (Right of Reception Area)** |
| 95 | 1 | L Shaped Partitioned Work Station with two overhead storage areas and two file cabinets underneath 9' x 6' |
| 96 | 1 | Blue/Black & Grey Secretary Chair (worn) |
| | | **Office 9 (Right of Reception Area)** |
| 97 | 1 | Grey Formica Desk - 3 drawers each side |
| 98 | 1 | Global 2 Drawer Black File Cabinet |
| 99 | 1 | Client Chair (worn) |
| 100 | 1 | Blue/Black & Grey Secretary Chair |
| 101 | 1 | 3' x 4' Dry Erase Board |
| | | **Kitchen** |
| 102 | 1 | Frigidaire Refrigerator with Top Freezer |
| 103 | 1 | Oval Fromica Table w/4 Chairs |
| 104 | 1 | Sharp Carousel Microwave |
| 105 | 1 | GE Turntable Microwave |
| 106 | 1 | Toaster Oven |
| 107 | 1 | Baby Gaggia Espresso Maker |
| 108 | 1 | 6' Wood Credenza (worn) |
| 109 | 1 | Bunn 3 Burner Coffee Maker |
| 110 | 1 | Water Cooler |
| 111 | Lot | Concept Pictures throughout Offices-valued for Frames |
| 112 | 1 | Dirt Devil Featherlite Vacuum |
| 113 | Lot | Assorted claeing solvents, toilet tissue, paper towels, cups, etc. in closet |
| | | **Warehouse (on and between pallet racking)** |
| 118 | Lot | Styrofoam componet piecesapproximately 15 pieces 3' x 8' |
| 119 | Lot | Approximately 15 windows various sizes (assumed PGT_ |
| 120 | Lot | Aluminum Beams |
| 121 | Lot | Various Sized Plywood |
| 122 | Lot | Approximately 13 Large Rolls Fabric |
| 123 | Lot | Approximately 5 Small Rolls Fabric |
| 124 | Lot | Assorted used rolls and pieces of Fiberglass cloth |
| 125 | 1 | Bath Tub Size and model unknown |
| 126 | 1 | Patio House in Box (not enough information to price) |
| 127 | Lot | Blue Rolls Airtech |
| 128 | Lot | Approximately 12+ Component Pieces Angeled Beams |
| 129 | Lot | BiFold Doors |

{Firm Clients\3412\3412-1\00914903.XLSX.}          3          Moecker Auctions, Inc.

3498 - Innovida                                  **Exhibit A**

| Item | Qty | Description |
|---|---|---|
| | | |
| | | **Between Pallet Racking on Floor** |
| 130 | 1 | Delta 24" Planer |
| 131 | 1 | Sulzer Mixpac Ag PDX 40-100-E  Serial #P01204  (2008) |
| 132 | Lot | 1" PVC Piping |
| 133 | 12 | Blue 55 gallon Plastic Barrels |
| 134 | 30 | Highwall Fan Coils MWCGC10S |
| 135 | 6 | Pyrogene Kieselsaure Foamed Silica (specialized for use in bonding) |
| 136 | 21 | PGT Windows - 38" x 38" |
| 137 | Lot | Assorted Motors, housings, electric boxes |
| 138 | Lot | Wiring/Hoses |
| 139 | Lot | Thermo Boden TBS TB 50 Underfloor Heating |
| 140 | Lot | 3 Large Rolls Fabric |
| 141 | Lot | Boxes on skid - contents unknown-not enough information |
| 142 | 3 | 6' Interior Panel Doors including frames |
| 143 | 1 | Variable Speed Geared Motor |
| 144 | Lot | Approximately 9 Sodium Warehouse Lights (assuming used condition) |
| 145 | 26 | 6'  Interior Panel Doors with frame |
| 146 | Lot | Aluminum Planking Against Wall |
| 147 | 5 | PGT Windows - 38" x 26" |
| 148 | 4 | PGT Windows - 38" x 38" |
| 149 | 10 | PGT Windows - 38 1/2" x 53" |
| 150 | 1 | Motor in Crate SCP1LOL-4 380/660  50HZ IP55 |
| 151 | Lot | Laminate used in bathrooms and on Walls |
| 152 | Lot | Various Sized Used Screens |
| 153 | 4 | PGT Windows 28" x 27" |
| 154 | Lot | Assorted Beams |
| 155 | Lot | Used Doors and Frames |
| 156 | 23 | Sections 16' High Medium Bolt Style Pallet Racking |
| | | **Outside Yard** |
| 157 | 1 | Prototype Trailer 35' x 8' - Furnished - 1 Bedroom, 1 Bath, Kitchen, Living Room |
| 158 | Lot | Componet Pieces in Dock Area |
| 159 | 1 | Prototype House 20' x 15' (locked, could not get inside) with Mitsubitshi MU - A12Wa Mr. Slim R410A A/C Unit |
| | | **Warehouse (Continued)** |
| 160 | 1 | Dewalt Duel Grinding Wheel |
| 161 | 1 | Delta Table Top Drill Press |
| 162 | 1 | Husky 1040 Fluid Pump |
| 163 | 1 | Dewalt DW616 Router |
| 164 | 1 | Dewalt Grinding Wheel |
| 165 | 1 | Dewalt Saw All |
| 166 | 4 | Electric Hand Held Fabric Cutters (Ro Buso) |
| 167 | 1 | Graco Xtreme 45:1 (Xtreme Mix Electronic Proportion, Series: BO5A, Part #233855) |
| 168 | 1 | Parts Washer |
| 169 | 1 | Flow Pro 4' Floor Fan |
| 170 | 1 | S/S Tub 8'ft Long |

Meecker Auctions, Inc.

3498 - Innovida                    **Exhibit A**

| Item | Qty | Description |
|------|-----|-------------|
| 171 | LOT | Clamps |
| 172 | 1 | Hand Truck |
| 173 | 1 | Propane Heating Unit |
| 174 | 1 | Electric Fabric Cutter (Ro Buso)(Broken) |
| 175 | 1 | Fluke T5-600 Tester |
| 176 | 1 | Fluke #116 Multimeter |
| 177 | LOT | Wrench, Hand Tools in 2 Storage Cabinets |
| 178 | 3 | Storage Cabinets |
| 179 | 1 | Microwave |
| | | **10' X 20' BREAK ROOM** |
| 180 | 1 | Refrigerator |
| 181 | 1 | Microwave |
| 182 | 1 | Water Cooler |
| | | **Warehouse (Continued)** |
| 183 | 1 | Graco Xtreme Mix Plural Component Porportioner Series: F10A (New in Box) |
| 184 | 1 | Kong Skiide Type: RC.CYKLON Dust Collector w/Motor & Blower |
| 185 | 1 | Digi Weigh Scale Model #DWP-102E |
| 186 | 1 | Pallet Jack |
| 187 | 1 | Toyota LPG 3 Stage w/Side Shift Fork Lift, 3,750LB Capacity, Hours: 18,284 |
| 188 | 1 | Uline Manual Strapping Machine |
| 189 | 1 | Ohaus SD Series Table Top Digital Scale |
| 190 | LOT | Miscellaneous: Straps |
| 191 | 1 | Roll of Bubble Wrap |
| | | **10' X 10' OFFICE** |
| 192 | 6 | Cases of 200/per case Disposable Masks |
| 193 | 25 | Cases of 25/per case Large Dust Collector Bags |
| 194 | LOT | Miscellaneous: Supplies in Closet |
| 197 | 1 | Desk |
| | | **10' X 20' OFFICE** |
| 201 | 3 | L-Shaped Desks |
| 202 | 9 | New Back Supports |
| 203 | 2 | 4 Drawer File |
| 204 | 12 | Fire Extinguishers |
| 205 | LOT | Hard Hats |
| 206 | 2 | Book Cases |
| 207 | LOT | Miscellaneous: Supplies in Closet |
| | | **Warehouse (Continued)** |
| 208 | 1 | Toyota LPG 3 Stage w/Side Shift Fork Lift, 4,950LB Capacity, Hours: 5,0089 |
| 209 | 1 | Cannon foam Manufacturing System, Made in Germany |
| 210 | 1 | Ingersoll Rand Compressor Model #SSR-XF300 S/N #DE15590U04229 |
| 211 | 1 | Ingersoll Rand Dryer Model #TS9A (2004) |

3498 - Innovida                    **Exhibit A**

| Item | Qty | Description |
|------|-----|-------------|
| 212 | 1 | 2,000 Gallon Air Tank |
| 213 | 1 | 275 Gallon Container w/Innopox III Epoxy Resin 1/3 Full |
| 214 | 1 | 275 Gallon Container w/Innocure 210 1/8 Full |
| 215 | | |
| 216 | 1 | Tec Mac SRL, VIA Mattei 32, 28066 Galliate- Italy, Model: Granulator, Type: TM AB-4, Year: 2008 |
| 217 | 1 | Tec Mac Model: TMV S/N #1603, Type: 2000R |
| 218 | 3 | Tec Mac Model: LID Support, Type: Square Blocks, Year: 2008 |
| 219 | | |
| 220 | 2 | Fork Lift Extensions |
| 221 | 4 | 4'ft Floor Fan |
| 222 | 1 | Workmaster Man Lift for Fork Lift |
| 223 | 4 | Custom Made Lamination Press w/Graco Xtreme Mix Part #F08a(x3) 45:1, Part #F10A |
| 224 | 1 | Carpet Dowel Fork Lift Attachment |
| 225 | 1 | 15'ft Fork Lift Extension |
| 226 | 1 | 5 Bay Mixing Station w/Pumps & Mixers |
| 227 | 1 | Blue 55 Gallon Drums of Epoxy Resin |
| 228 | 5 | Black 55 Gallon Drums of Acetone |
| 229 | 1 | Green 55 Gallon Drums of GNS SG-8011 Reactive Diluents |
| 230 | 11 | Red 55 Gallon Drums of Iso PMD1 92140 |
| 231 | 10 | Blue 55 Gallon Drums of Elastopor H 2011/4 |
| 232 | 4 | Black 55 Gallon Drums of Rubinate 5005 |
| 233 | 4 | Light Brown 55 Gallon Drums of Rubitherm TM 23200 |
| 234 | 18 | 275 Gallon Container of Innopox III Epoxy Resin |
| 235 | 2 | 275 Gallon Container of Innocure 210 Epoxy Hardener |
| 236 | 2 | 275 Gallon Container of Innopox 110 |
| 237 | 18 | Rolls of Fiberglass Material (327 yards X 96" each) |
| 238 | 1 | Grizzly G0451 Table Saw |
| 239 | 1 | Delta Model #50-763, 4 Bag Dust Collector |
| 240 | 1 | Donaldson Torit Model #DWS 6 Dust Collector |
| 241 | 1 | Trima CNC Circular Saw w/42'ft Table, Dust Collector and Cooling System |
| 242 | 1 | Blue Dump Container |
| 243 | LOT | Air Hoses |
| 244 | 1 | 12'ft A-Frame Ladder |
| 245 | 2 | Extension Ladders |
| 246 | 2 | 6'ft A-Frame Ladders |
| | | **INVENTORY OF BUILDING MATERIALS** |
| 247 | 180 | 4' X 8' Boards of Perma Base Cement Boards |
| 248 | 16 | 5 Gallon Containers of Joint Compound |
| 249 | 7 | GE 125 Amp Breaker Boxes 12 Space 24 Circuit |
| 250 | 48 | Rolls of Blue Painter Tape |
| 251 | 48 | Fluorescent Lighting Fixtures 2' X 4' |
| 252 | 8 | Double Doors Pre Hung (Steel) by JE.I.D.WEN |
| 253 | 4 | Single Pre Hung Doors by JE.I.D.WEN |
| 254 | 7 | PGT Windows Various Sizes |
| 255 | 242 | "U" Shaped Fiberglass Beams 10'ft Long |
| 256 | 1 | 275 Gallon Holding Container (Empty) |

Moecker Auctions, Inc.



3498 - Innovida                               **Exhibit A**

| Item | Qty | Description |
|------|-----|-------------|
|      |     |             |
| 257  | 4   | Pedestal Sinks by Pro Flo |
| 258  | LOT | Miscellaneous: Construction, Plumbing, Supplies |
| 259  | 364 | "I" Shaped Fiberglass Beams 10'ft Long |
| 260  | 7   | Pro Flo Toilets |
| 261  | 16  | 5 Gallon Containers of Seal O Flex Water Proofing |
| 262  | 10  | Aerosil 200 |
| 263  | 2   | Boxes of Dry Wall Screws |
| 264  | 62  | PVC Pipes 20'ft Long |
| 265  | LOT | Fiberglass/Foam core Beams & Walls for Fabrication of Housing |
| 266  | LOT | Foam Sheets 4" Thick by Various Sizes |
| 267  | 77  | Cases of PVC Elbows & Fittings |
| 268  | LOT | Items on Pallet Racking consisting of Tile Samples, Spare Parts, Samples of Door & Frame, Plumbing, Panels, Tarps etc. |
| 269  | 1   | 12,000 BTU Room Air Conditioner |

Moecker Auctions, Inc.

# EXHIBIT B

20

## ALL INNV Patent Applications

| OUR REF | TYPE | SERIAL NO | PATENT NO | TITLE | STATUS | FILE | ISSUE | EXPIRATION | USPTO | WIPO | European Patent Office |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INNVP0106US | UTL | | | INNOVIDA LAMINATING SYSTEM | PROPOSED | | | | | | |
| INNVP0114US | UTL | | | CEILING CONSTRUCTION MADE OF SANDWICH PANELS WITH DOUBLE PANEL WALLS | INACTIVE | | | 8/6/2008 | | | |
| INNVP0101US | UTL | 12/101,620 | | STRAIGHT JOINT FOR SANDWICH PANELS AND METHOD OF FABRICATING SAME | ABANDONED | 4/11/2008 | | 8/4/2010 | X | X | X |
| INNVP0102US | UTL | 12/101,646 | | SANDWICH PANEL WITH CLOSED EDGE AND METHODS OF FABRICATING | PENDING | 4/11/2008 | | 4/11/2028 | X | X | X |
| INNVP0103US | UTL | 12/119,671 | | ANGLED JOINT FOR SANDWICH PANELS AND METHOD OF FABRICATING SAME | ABANDONED | 5/13/2008 | | 1/22/2010 | X | | X |
| INNVP0104US | UTL | 12/138,572 | | ROOF CONSTRUCTION JOINTS MADE OF SANDWICH PANELS | PUBLISHED | 6/13/2008 | | 6/13/2028 | X | | X |
| INNVP0106US | UTL | 12/142,865 | | CONNECTION FOR SANDWICH PANEL AND FOUNDATION | ABANDONED | 6/20/2008 | | 9/20/2010 | X | | |
| INNVP0105US | UTL | 12/147,795 | | SANDWICH PANEL GROUND ANCHOR AND GROUND PREPARATION FOR SANDWICH PANEL STRUCTURES | PENDING | 6/27/2008 | | 6/27/2028 | X | | X |
| INNVP0116US | UTL | 12/170,720 | | BUILDING ROOF STRUCTURE HAVING A ROUND CORNER | DROPPED | 7/10/2008 | | 12/1/2009 | X | | X |
| INNVP0112US | UTL | 12/201,285 | | JOINT OF PARALLEL SANDWICH PANELS | PUBLISHED | 8/29/2008 | | 8/29/2028 | X | | X |
| INNVP0119US | UTL | 12/201,687 | | A SANDWICH PANEL JOINT AND METHOD OF JOINING SANDWICH PANELS | PUBLISHED | 8/29/2008 | | 8/29/2028 | X | | X |
| INNVP0115US | UTL | 12/204,576 | | SYSTEM AND METHOD OF FORMING AT LEAST A PORTION OF A REINFORCED ROOF STRUCTURE FROM SANDWICH PANELS | ABANDONED | 9/4/2008 | | 10/27/2010 | X | | X |
| INNVP0110US | PRV | 61/103,353 | | COLUMNAR STRUCTURAL COMPONENT AND METHOD OF FORMING | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0111US | PRV | 61/103,357 | | COLUMNAR STRUCTURAL COMPONENT AND METHOD OF FORMING | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0120US | PRV | 61/103,359 | | APPARATUS AND METHOD FOR PRODUCING A MULTI-AXIS LAMINATE | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0109US | PRV | 61/103,365 | | COMPOSITE SANDWICH PANELS AND METHOD OF FORMING ROUND CORNERS IN COMPOSITE SANDWICH PANELS | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0117US | PRV | 61/103,370 | | NOZZLE SYSTEM AND METHOD FOR MANUFACTURING COMPOSITE SANDWICH PANELS | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0118US | PRV | 61/103,373 | | SYSTEM AND METHOD FOR USING AN ACETONE SOLVENT TO CLEAN MANUFACTURING EQUIPMENT USED TO MANUFACTURE COMPOSITE SANDWICH PANELS | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0107US | PRV | 61/103,379 | | MULTIPLE PANEL BEAMS AND METHODS | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0108US | PRV | 61/103,381 | | MULTIPLE PANEL COLUMN AND METHODS | EXPIRED | 10/7/2008 | | 10/7/2009 | X | | |
| INNVP0113US | PRV | 61/103,387 | | CEILING SUPPORT CONSTRUCTION AND METHODS | EXPIRED | 10/7/2008 | | 10/7/2009 | | | |

| OUR REF | TYPE | SERIAL NO | PATENT NO | TITLE | STATUS | FILE | ISSUE | EXPIRATION | USPTO | WIPO | European Patent Office |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INNVP0004WO | UTL | PCT/EP07/002350 | | SANDWICH ELEMENT | EXPIRED | 3/16/2007 | | 10/17/2008 | | X | X |
| INNVP0001WO | UTL | PCT/EP07/002591 | | COMPOSITE OF TWO SANDWICH PANELS | NAT PHASE | 3/23/2007 | | | | X | X |
| INNVP0002WO | UTL | PCT/EP07/002684 | | SANDWICH PLATE COMPOSITE | NAT PHASE | 3/27/2007 | | | | X | X |
| INNVP0003WO | UTL | PCT/EP07/003379 | | METHOD AND DEVICE FOR THE PRODUCTION OF A SANDWICH PANEL | NAT PHASE | 4/17/2007 | | | | X | X |
| INNVP0101WO | UTL | PCT/IB09/005223 | | STRAIGHT JOINT FOR SANDWICH PANELS AND METHOD OF FABRICATING SAME | PUBLISHED | 4/13/2009 | | | X | X | |
| INNVP0102WO | UTL | PCT/IB09/005230 | | SANDWICH PANEL WITH CLOSED EDGE AND METHODS OF FABRICATING | PUBLISHED | 4/13/2009 | | | X | X | |
| INNVP0103WO | UTL | PCT/IB09/005593 | | ANGLED JOINT FOR SANDWICH PANELS AND METHOD OF FABRICATING SAME | ABANDONED | 5/13/2009 | | 8/13/2009 | X | X | |



# **EXHIBIT C**

21

3498 - innovida                    Exhibit C

| | | Innovida Services |
|---|---|---|
| | | 470 NE 185 Street |
| | | North Miami Beach, FL |
| | | June 7, 2011 |
| **Item** | **Qty** | **Description** |
| 273 | 8 | Black Vinyl Arm Chairs |
| 274 | 2 | Herman Miller Aeron Mesh Rolling Arm Chairs w/Polished Base |
| 275 | 10 | Herman Miller Style Mesh Rolling Arm Chairs |
| 276 | 2 | Mesh Back Arm Chairs |
| 277 | 1 | Bungee cord Rolling Arm Chair |
| 278 | 1 | Black Microfiber Chair |
| 280 | 1 | LG 42" LCD TV |
| 283 | 1 | Apple 22" All-in-one Computer |
| 284 | 1 | Apple iPad 1st Generation |
| 285 | 12 | Astra Telecom Phones |
| 286 | 1 | Hitachi CP-RX70 XGA Projector |
| 287 | 1 | Firebox X500 |
| 288 | LOT | Miscellaneous: Software |
| 289 | LOT | Miscellaneous: Computer Hardware |
| 290 | 2 | Rolling Metro Racks |
| 291 | 2 | Laptop Cases |
| 295 | 1 | Mac Book Pro 15" |
| 296 | 1 | 7' x 7' Custom Glass Conference Table |
| 297 | 1 | 6' Glass and Wood Credenza (matches conference Table) |
| 298 | 3 | Garbage Cans |
| | | |
| | | |

1                    Moecker Auctions, Inc.

# EXHIBIT D

22

# **Exhibit D**

Any and all tangible and intangible Assets of Innovida Holdings, LLC, including but not limited to, vendor lists, customer lists, manufacturer lists, architectural plans, engineering plans, know-how, goodwill, and all intellectual property (including the trademarks listed in the following pages in this Exhibit D). The tangible and intangible Assets do not include Excluded Assets and the Assets confined to the Option.



| | TRADEMARKS | Status | Check | Registration Date |
|---|---|---|---|---|
| **Owner** | InnoVida Holdings, LLC | | | |
| **Word Mark** | **INNOVIDA** United States Trademark Registration No 3525043 | Live | Registered | 28/10/2008 |
| **Goods and Services** | **IC 001.** US 001 005 006 010 026 046. G & S: adhesive materials for use in building and construction, namely, bonding material for use in the installation of non-metal composite wall panels, roof panels and internal or external building panels for use in the construction or repair of houves, buildings, offices and warehouses. | | | |
| **Owner** | InnoVida Holdings, LLC | | | |
| **Word Mark** | **INNOVIDA** United States Trademark Registration No 3525047 | Live | Registered | 28/10/2008 |
| **Goods and Services** | **IC 042.** US 100 101. G & S: civil engineering, planning of buildings and infrastructure systems for buildings, and architectural desing services, all in the field of residential and commercial structures, houses, buildings, offices and warehouses containing wall panels, roof panels and internal or external building panels made of non-metal composite materials. | | | |
| **Owner** | InnoVida Holdings, LLC | | | |
| **Word Mark** | **INNOVIDA** United States Trademark Registration No 3525045 | Live | Registered | 28/10/2008 |
| **Goods and Services** | **IC 041.** US 100 101107. G & S: educational services, namely, training others in the proper use and installation of building and construction materials, wall panels, roof panels and internal or external building panels made of non-metal composite materials for use in the construction or repair of houses, buildings, offices and warehouses. | | | |

| Owner | InnoVida Holdings; LLC |
|---|---|
| Word Mark | **INNOVIDA** United States Trademark Registration No 3525044 |
| Goods and Services | **IC 037**, US 100 103 106. G & S: residential and commercial building construction and repair services; construction supervision services; construction planning services; construction management services; construction consultation services; building inspection services in the course of building construction. |

Live    Registered    28/10/2008

| Owner | InnoVida Holdings, LLC |
|---|---|
| Word Mark | **INNOVIDA** United States Trademark Registration No 3517408 |
| Goods and Services | **IC 019**, US 001 012 033 050. G & S: building and construction materials, namely, wall panels, roff panels and internal or external building panels made of non-metal composite materials for use in the construction or repair of houses, buildings, offices and warehouses; prefabricated non-metal building structural components sold in kit form comprising pre-cut and uncut wall panels, roof panels and internal or external building panels made of non-metal composite materials to be assembled on site in the construction of houses, building, offices and warehouses. |

Live    Registered    14/10/2008

| Owner | InnoVida Holdings, LLC |
|---|---|
| Word Mark | **INNOVIDARESIN** United States Trademark Registration No 3525050 |
| Goods and Services | **IC 019**, US 001 012 033 050. G & S: building and construction materials, namely, wall panels, roof panels and internal or external building panels made of non-metal composite materials for use in the construction or repair of houses, buildings, offices and warehouses; and synthetic resin core material sold as a component feature of non-metal composite building and construction materials, namely, wall panels, roof panels and internal or external panels |

Live    Registered    28/10/2008

| | |
|---|---|
| **Owner** | InnoVida Holdings, LLC |
| **Word Mark** | **INNOVIDABOND** United States Trademark Registration No 3525049 |
| **Goods and Services** | **IC 001**, US 001 005 006 010 026 046. G & S: adhesive materials for use in building and construction, namely, bonding material for use in the installation of non-metal composite wall panles, roof panels and internal or external buildings panels used in the construction or repair of houses, buildings, offices and warehouses. |

**Live**   **Registered**   28/10/2008

| | |
|---|---|
| **Owner** | InnoVida Holdings, LLC |
| **Word Mark** | **INNOVIDAPANEL** United States Trademark Registration No 3525048 |
| **Goods and Services** | **IC 019**, US 001 012 033 050. G & S: building and construction materials, namely, wall panels, roof panels and internal or external building panels made of non-metal composite materials for use in the construction or repair of houses, buildings, offices and warehouses. |

**Live**   **Registered**   28/10/2008

| | |
|---|---|
| **Owner** | InnoVida Holdings; LLC |
| **Word Mark** | **INNOTAPE** United States Trademark |
| **Goods and Services** | **IC 024**, US 019. G & S: for resin – saturated fiberglass flexible tape for use in joining building and construction materials, wall panels, roof panels, and internal or external building panels, used in the construction or repair of boatsrm house, buildings; offices, warehouses, truck trailers and mobile homes. |

**Dead**

# EXHIBIT E

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that Mark S. Meland, solely in his capacity as Chapter 11 Trustee (the "Seller" and/or "Trustee") for the jointly administered estates of InnoVida Holdings, LLC ("Holdings"), InnoVida Services, Inc. ("Services"), InnoVida MRD, LLC ("MRD"), and InnoVida Southeast, LLC ("Southeast"), and , and as Court-appointed receiver (the "Receiver") for Holdings and its numerous affiliates and subsidiaries in the state court action styled *Chris Korge v. Claudio Osorio, Amarilis Osorio, Craig Toll and Innovida Holdings, LLC*, Case No.: 10-51885-CA-32 ("State Court Action")., for and in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration, lawful money of the United States in hand paid by Millport Associates, S/A ("Buyer"), the receipt whereof is hereby acknowledged, does hereby grant, bargain, sell, transfer, quitclaim and deliver unto the Buyer, their heirs, executors, administrators and assigns, all of Sellers' rights, title and interest to the following fixed items of fixtures and personal property (the "Personal Property"):

SEE EXHIBIT A-D ATTACHED HERETO AND MADE A PART HEREOF BY REFERENCE.

All Personal Property listed above are being sold AS IS - WHERE IS, in or on the premises located at: 470 NE 185th Street, North Miami Beach, FL 33179.

TO HAVE AND TO HOLD the Personal Property unto the Buyer, its successors and assigns.

This instrument shall be binding upon an inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors, or assigns

[SIGNATURES CONTINUED ON NEXT PAGE]

23

IN WITNESS WHEREOF, the undersigned has set my hand and seal this ___ day of May, 2011.

Innovida Holdings, LLC
Debtor-in-Possession

By: _____
                Mark S. Meland, Chapter 11 Trustee

Innovida Southeast, LLC
Debtor-in-Possession

By: _____
                Mark S. Meland, Chapter 11 Trustee

Innovida Services, Inc.
Debtor-in-Possession

By: _____
                Mark S. Meland, Chapter 11 Trustee

InnoVida MRD, LLC
Debtor-in-Possession

By: _____
                Mark S. Meland, Chapter 11 Trustee

Innovida Factories, Ltd.

By: _____
                Mark S. Meland, Receiver

