**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

| In re:<br><br>CLAUDIO ELEAZAR OSORIO<br>and AMARILIS MORAN OSORIO,<br><br>    Debtors. | Case No.  11-17075-RAM<br><br>Chapter 11 |
|---|---|

| In re:<br><br>INNOVIDA HOLDINGS, LLC<br>F/D/B/A COEG, LLC,<br><br>    Debtor. | Case No.11-17702-RAM<br><br>Chapter 11 |
|---|---|

| In re:<br><br>INNOVIDA MRD, LLC<br><br>    Debtor. | Case No.  11-17704-RAM<br><br>Chapter 11 |
|---|---|

| In re:<br><br>INNOVIDA SERVICES, LLC<br><br>    Debtor | Case No.  11-17705-RAM<br><br>Chapter 11 |
|---|---|

| In re:<br><br>INNOVIDA SOUTHEAST, LLC<br><br>    Debtor | Case No.  11-17706-RAM<br><br>Chapter 11 |
|---|---|

## FIRST AMENDED PLAN OF REORGANIZATION

Submitted by: Claudio Eleazar Osorio, Amarilis Moran Osorio

Respectfully submitted

**Aaronson Schantz P.A.**

s/Geoffrey S Aaronson
Geoffrey S Aaronson
Florida Bar No. 349623
Miami Tower
100 SE 2nd Street, 27th Floor
Miami, Florida 33131
Tel. 786.594.3000
Fax 305.675.3880
gaaronson@aspalaw.com
*Attorney for Claudio and Amarilis Osorio*
*Debtors*

## *Contents*

ARTICLE I: *DEFINITIONS*.................................................................................................4

ARTICLE II: SUMMARY OF THE PLAN..............................................................................11

ARTICLE III: CONSOLIDATION OF CASES .........................................................................13

ARTICLE IV: SOURCE OF FUNDS ....................................................................................13

ARTICLE V:  SECURITY FOR PAYMENT OF DISTRIBUTIONS .........................................15

ARTICLE VI:  USE OF FUNDS .........................................................................................17

ARTICLE VI: ADMINISTRATIVE CLAIMS AND OPERATING EXPENSES.......................17

ARTICLE VII: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .....19

ARTICLE VIII: CONVERSION RIGHTS ..............................................................................21

ARTICLE IX:ACCEPTANCE OR REJECTION OF THE PLAN................................................22

ARTICLE X: MEANS OF IMPLEMENTING THE PLAN.........................................................22

ARTICLE XI: AVOIDANCE ACTIONS .............................................................................23

ARTICLE XII: EXEMPT PROPERTY .................................................................................23

ARTICLE XIII: PROVISIONS FOR AND DISTRIBUTIONS IN RESPECT OF

CONTESTED CLAIMS AND INTERESTS ..........................................................................24

ARTICLE XIV: EFFECT OF THE PLAN ON CLAIMS AND INTERESTS.............................24

ARTICLE XIV: EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........................26

ARTICLE XV: EFFECTIVENESS OF THE PLAN .................................................................28

ARTICLE XVI: ADMINISTRATIVE PROVISIONS .................................................................29

ARTICLE XVII: MISCELLANEOUS ...................................................................................29

CLAUDIO ELEAZAR OSORIO (hereafter "C Osorio") and AMARILIS MORAN OSORIO (hereafter "A Osorio" and collectively "Osorios" or "Debtors") hereby file their Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et al., (hereafter the "Plan").

Please address all inquiries concerning this Plan, the Disclosure Statement in support of the Plan, and voting to:

Geoffrey S. Aaronson, Esq.
Steven L Beiley, Esq.
Aaronson Schantz P.A.
Miami Tower
100 SE 2nd ST, 27th Floor
Miami, Florida 33131
Tel. 786.594.3000
Fax 305.675.3880
gaaronson@aspalaw.com
sbeiley@aspalaw.com

## ARTICLE I: DEFINITIONS

1.    The capitalized terms used in the Plan shall have the meanings set forth in the numbered Paragraphs of this Article.

a.    *Administrative Expense* means any right to payment constituting a cost or expense of administration of this Case that is Allowed under sections 503(b), 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estate, (b) any actual and necessary costs, expenses or indebtedness or obligations incurred or assumed by the Debtors in the ordinary course during the Case, (c) any compensation for professional services rendered and reimbursement of expenses incurred, to the extent Allowed by Final Order under section 330 or 503 of the Bankruptcy Code, (d) all fees and charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code, and (e) all post-petition taxes.

b.    *Agreed Exempt Homestead Proceeds* shall mean 1/3 interest in the net proceeds from the sale of the Star Island Property after payment of the first and second mortgages, brokerage commissions, and all closing costs as authorized and approved by the Court in connection with the sale of the Star Island Property. Notwithstanding the exempt nature of this interest, the Debtors shall place a Plan Mortgage in favor of the Estate Representative on their New Homestead equal to 50% of their Exempt Homestead Proceeds, to secure the first 50% of the payments required under the Plan.

c.    *Agreed Non-Exempt Homestead Proceeds* shall mean 2/3 interest in the net proceeds from the sale of the Star Island Property after payment of the first and second

mortgages, brokerage commissions, and all closing costs as authorized and approved by the Court in connection with the sale of the Star Island Property.

        d.    *Allowed* means with reference to any Claim, (a) any Claim against the Debtors, which has been listed by the Debtors in their Schedules (as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1007) as liquidated in amount and not disputed or contingent and for which no proof of Claim has been filed, (b) any Claim against the Debtors which is the subject of a duly filed and timely proof of claim that has not been objected to by the Debtors, (c) any Claim as to which the liability of the Debtors and the amount thereof are determined by a Final Order; and (d) any Claim against the Debtors allowed pursuant to this Plan, and  any Claim or Administrative Expense expressly allowed under this Plan or by the Court. Unless otherwise specified in this Plan or ordered by the Court, "Allowed Claim" or "Allowed Administrative Expense" shall not include interest on such Claim or Administrative Expense from and after the Petition Date.

        e.    *Available Net Income* shall mean, with regard to the Initial Distribution, 95% of all cash accumulated from the business of the SPV over the first six months of operations (after payment of the costs of raw materials, labor costs, manufacturing costs, and all general and administrative Expenses), and with regard to Subsequent Distributions, 95% all cash accumulated from the business of the SPV over the prior six months of operations (after payment of the costs of raw materials, labor costs, manufacturing costs, and all general and administrative Expenses).

        f.    *Ballot* shall mean the form or forms distributed to each holder of a Claim or an Impaired Claim or Interest on which the holder indicates acceptance or rejection of the Plan or any election for treatment of such Claim or Interest under the Plan.

        g.    *Ballot Date* shall mean the date set by the Court by which all Ballots must be received.

        h.    *Bankruptcy Code* or *Code* shall mean Title 11 of the United States Code, as in effect from time to time, as applicable to these Chapter 11 cases.

        i.    *Bankruptcy Rules* shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time as applicable to the Chapter 11 Case, including the Local Rules of the Court.

        j.    *Business Day* shall mean any day except a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a) and the Court's Local Rules.

        k.    *Cases* shall mean the cases commenced by the Debtors and the InnoVida Holdings, LLC Cases commenced by the Trustee in the Bankruptcy Court on or after the Osorio Petition Date under Chapter 11 of the Bankruptcy Code.

        l.    *Cash Collateral* shall mean the proceeds of the Debtors' prepetition collateral.

m.     *Chapter 11 Case* shall mean the Debtors' above-captioned Chapter 11 cases.

n.     *Claim* shall have the meaning as defined in section 101(5) of the Bankruptcy Code, including, without limitation, any right to payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, uncontested, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmeasured, contested, uncontested, secured or unsecured.

o.     *Claims Bar Date* shall mean: For all creditors (except a governmental unit), July 19, 2011; and for a governmental unit, September 13, 2011.

p.     *Claims Objection Date* shall mean, absent a Court Order setting forth otherwise, 30 days before Confirmation Hearing, which shall be the last day by which the Debtors, or any other interested party, may file an Objection to any Claim, whether such Claim derives from the Debtors' Schedules, or from a filed Proof of Claim.

q.     *Class* shall mean a group of Claims or Interests as classified under the Plan.

r.     *Collateral* shall mean the real estate, inventory, equipment, accounts, general intangibles, fixtures, money, instruments, securities, documents, chattel paper, deposits, credits, claims, and other real and personal property owned by the Debtors together with the proceeds, products, offspring, rents, or profits thereof, as the case may be, in connection with the Debtors' pledge of some or all of these items to a creditor pursuant to a secured transaction.

s.     *The Colorado Property* shall mean the 50% interest held by the Osorios through Mountain Homes, LLC, in a ski house in Telluride, Colorado.

t.     *Confirmation Hearing* shall mean the hearing conducted by the Court to hear and determination confirmation of this Plan as may be amended as of said hearing.

u.     *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

v.     *Confirmation Hearing* means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

w.     *Confirmation Order* means the order or orders of the Bankruptcy Court confirming this Plan.

x.     The *Consolidated Debtors* shall mean the the Osorios and the InnoVida Holdings LLC Cases.

y.      The *Consolidated Estate* shall mean the bankruptcy estates of the Osorios and the InnoVida Holdings LLC Cases.

z.      *Contested Claim* shall mean a Claim (or portion thereof) for which: (a) a proof of claim was or is deemed filed under applicable law or Order of the Court; and (b) any such timely and properly filed objection is not: (i) withdrawn or resolved by stipulation or (ii) determined in whole or part by a Final Court Order.

aa.      The *Court* or the *Bankruptcy Court* shall mean the United States Bankruptcy Court for the Southern District of Florida (Miami Division) or any other Court that exercises jurisdiction over this Chapter 11 Case and the InnoVida Holdings Cases.

bb.      *Creditor* shall mean the holder of a Claim, whether or not such creditor was scheduled by the Debtors or filed a Claim.

cc.      *Creditors' Committee* shall mean the official committee of creditors as approved by the Court in the InnoVida Holdings, LLC Cases. It shall also refer to the Creditors' Committee post Confirmation. The Creditors' Committee shall continue to exist and serve post Confirmation until the Plan Mortgage is

dd.      *Debtors* shall mean C Osorio, his wife Amarilis Moran Osorio, and the InnoVida Holdings, LLC Cases. *C. Osorio* shall mean Claudio Eleazar Osorio. The *Osorios* shall mean C. Osorio and Amarilis Moran Osorio.

*ee.*      *Debtor's Counsel* shall mean the Debtors' present counsel, Aaronson Schantz P.A.

ff.      *Disclosure Statement* means that certain Disclosure Statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, Rule 3017 of the Bankruptcy Rules and Rule 3017-1 of the Local Rules. The proposed Disclosure Statement accompanies this Plan.

gg.      *Distributions* shall mean a total of ten payments (which may be increased to 16 payments as set forth below) in satisfaction of  Administrative Expenses and Creditors, with the first payment made on the Effective Date, and with subsequent payments made every four months commencing on the sixth month after the Effective Date. The *First Distribution* or *Initial Distribution* shall mean the distribution on the Effective Date. *Subsequent Distributions* shall be the distributions after the First Distribution. Distributions shall derive first, from the Sale of the Real Estate and from Available Net Income generated by the SPV, as well as the liquidated sum from the sale of all assets sold by the Trustee during the administration of this case. If Distributions do not pay Creditors in full within the first ten payments, up to six more payments shall be made (thereby requiring Distributions over a period of five and one half years) until payments total 100% of Allowed Claims.

hh.    *Effective Date* shall be 20 days after entry of the Confirmation Order if there are no appeals or stays entered, or five days after the Confirmation Order becomes a Final Order.

ii.    *Effective Date Disbursing Agent* shall be Mark Meland, who is presently the Chapter 11 Trustee of the InnoVida Holdings LLC Cases.

jj.    *Equity Holders* shall mean the Osorios and all shareholders of InnoVida Holdings who elect to own an interest in the SPV as set forth in this Plan. The shareholders of InnoVida Holdings who elect to own an interest in the SPV shall own their interests in SPV in the same proportion as their proportional ownership of InnoVida Holdings.

kk.    *Estate Representative* shall mean a nominal representative of the Creditors' Committee, determined by the Creditors' Committee, to be the named mortgagee of the Plan Mortgage and to have certain other limited roles defined in this Plan.  The Estate Representative will be the representative of and nominee of the Creditors' Committee.  The Estate Representative will not have any discretion to declare a default or to foreclose on the Plan Mortgage without authorization from the Creditors' Committee.  The Creditors' Committee shall direct the Estate Representative only upon duly noticed and constituted meeting with an appropriate quorum and after duly recorded resolution.

ll.    *Existing Homestead* shall mean the Star Island Property.

mm.    *Existing Organizational Documents* mean the articles of incorporation, and any other charter documents legally forming and/or organizing the SPV.

nn.    *Final Order* means an order or judgment of a court of competent jurisdiction, which has been entered on the docket maintained by the clerk of such court, and which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

oo.    *General Unsecured Claim* means any Claim that arose or accrued prior to the Petition Date that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, or Secured Claim, but including, without limitation, Claims arising from the rejection of an unexpired lease or executory contract pursuant to this Plan or other Final Order of the Bankruptcy Court. General Unsecured Claims shall include all claims filed in the InnoVida Holdings Case.

pp.    *Homestead Proceeds* shall mean the net proceeds from the sale of the Star Island Property after payment of the first and second mortgages, brokerage commissions, and all closing costs as authorized and approved by the Court in connection with the sale of the Star Island Property.

qq.    *Impairment* of claims or interests means that a class of claims or interests is impaired under the Plan if the plan alters the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. A class of claims or interests is unimpaired if the Plan, with respect to such class of claims or interests, leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

rr.    *InnoVida* shall mean InnoVida Holdings and its subsidiaries.

ss.    *InnoVida Holdings* shall mean InnoVida Holdings, L.L.C., in Chapter 11 proceedings under Case No. 11-17702-RAM. The *InnoVida Holdings Case* shall refer to InnoVida Holdings, L.L.C. Chapter 11 case.

tt.    *InnoVida Holdings, LLC Cases* shall refer to the Bankruptcy cases of InnoVida Holdings, L.L.C., InnoVida MRD, LLC, Case No. 11-17704-RAM, InnoVida Southeast, LLC, Case No. 11-17706-RAM, and InnoVida Southeast LLC, Case No. 11- 17706 RAM.

uu.    *Interested Parties* shall mean, collectively, the Debtors, creditors and any others who have an interest in the Bankruptcy Case.

vv.    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

ww.    *Miami-Dade County Real Estate Taxes* means all *ad valorem* real property taxes assessed by Miami-Dade County on any property owned by the Debtors.

xx.    *Miami Factory Proceeds* means the proceeds from the sale of the Miami factory owned by InnoVida Southeast, Inc., which sale was authorized by the Court on August 22, 2011 (DE 287 in InnoVida Case).

yy.    *New Homestead* shall mean the Debtors' new homestead property which shall be purchased from Exempt Homestead Proceeds.

zz.    *Osorio Petition Date* means March 17, 2011, the date that the Osorios commenced this Case.

aaa.    *Plan* or *Plan of Reorganization* means this Plan of Reorganization, including, without limitation, any supplement to the Plan, the exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

bbb.    *Plan Distributions* shall mean all the Distributions as set forth in this Plan.

      *ccc.*    *Plan Mortgage* shall mean a mortgage on the Debtors' New Homestead property equal to 50% of their Exempt Homestead Proceeds, to secure the first 50% of the payments required under this Plan. After payment of the first 50% of the payments required under this Plan, the Plan Mortgage shall be released by the Estate Representative.

      ddd.    *Post Effective Date Disbursing Agent* shall be the Estate Representative.

      *eee.*    *Priority Claim* shall mean any Claim, if Allowed, entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than an Administrative Claim.

      *fff.*    *Professional Fees* shall mean all Claims under Section 330(a), 331 or 503 of the Bankruptcy Code for compensation for professional services rendered and reimbursement of expenses in and during this Chapter 11 Case as approved by the Court.

      *ggg.*    *Pro Rata Share* shall mean with reference to any distribution on account of any Allowed Claim or Allowed Interest in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim or Allowed Interest bears to the aggregate amount of all Allowed Claims or Interests of the same Class.

      *hhh.*    *Reorganization Account* shall mean a segregated bank account to be opened by the Debtors prior to the Effective Date, and into which the Debtors will deposit Available Net Income for the payments required by this Plan.

      *iii.*    *Reorganized Debtors* means the Debtors upon and after entry of the Confirmation Order.

      *jjj.*    *Replacement Homestead* means the home purchased by the Osorios using proceeds from the sale of the Homestead.

      *kkk.*    *Real Estate Proceeds* shall mean the sum of the Homestead Proceeds, the Switzerland Property Proceeds and the Colorado Property Proceeds.

      *lll.*    *Sale of Real Estate* shall mean the sale of the Existing Homestead, the Switzerland Property and the Colorado Property.

      *mmm.* *Schedules* shall mean the Schedules of assets and liabilities and the statements of financial affairs filed by the Debtors, as required by Section 521 of the Bankruptcy Code and the Bankruptcy Rules.

      *nnn.*    *Secured Claim* means a Claim secured by a Lien on the Debtors' property, which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, but solely to the extent of the value of such creditor's interest in the Debtors' interest in the property. A secured claim is deemed secured to the extent defined by 11 USC § 506(a) and (b) of the Bankruptcy Code.

ooo.    *Secured Claim of Miami Dade County for Real Estate Taxes* means any duly filed ad valorem tax claim of the Miami-Dade County Tax Collector for all real and personal property taxes against Debtors.

ppp.    *SPV* shall mean a company to be formed by the Osorios to engage in (a) the sale of factories that manufacture resin composite building materials, and (b) that will manufacture, sell, distribute and construct building structures including but not limited to  homes, office buildings, and schools.

qqq.    The *SPV Enterprise* shall mean the SPV business which shall produce sufficient cash a profit to fund the Plan.

rrr.    The *Star Island Property* shall mean the residence property presently owned by the Debtors located at 15 Star Island, Miami Beach, Florida.

sss.    The *Substantively Consolidated Debtors* shall refer to the Osorios and the InnoVida Holdings LLC Cases as a single obligor of all Allowed Claims under the Plan.

ttt.    The *Switzerland Property* shall mean the Residence Les Michabels duplex style condominium in Crans-Montana, Switzerland, which is owned by the Osorios.

uuu.    The *Trustee* shall mean Mark Meland, solely as Trustee of the InnoVida Holdings, LLC Cases.

vvv.    The *Unsecured Creditors' Committee* shall be the Committee appointed by the office of the United States Trustee in InnoVida Holdings.   The Unsecured Creditors Committee is comprised of various unsecured creditors in InnoVida Holdings, who represent the InnoVida Holdings general unsecured creditor body.

## ARTICLE II: SUMMARY OF THE PLAN

This Plan provides for the substantive consolidation of all Debtors and 100% payment to all Allowed Creditors of the Substantively Consolidated Debtors. It contemplates the Sale of Real Estate and the formation of a new entity, the SPV.  It contemplates the distribution of cash on the Effective Date and thereafter, which will derive from the Sale of Real Estate, the Miami Factory Proceeds, other funds remaining in the Consolidated Estate as of the time of entry of the Confirmation Order, and the SPV Enterprise. It is contemplated that the Sale of Real Estate alone will generate over $4.0 Million dollars which will pay Allowed Claims under the Plan. There also will be approximately $500,000.00 devoted to Distributions under the Plan from the Miami Factory Proceeds. Over a period not to exceed 5½ years after the Effective Date, the SPV Enterprise is projected to generate sufficient funds to pay all Allowed Claims their remaining Allowed Claims in full.

The Plan also resolves all Creditor non-dischargeability claims against the Osorios by paying all Allowed Claims in full in an organized manner, pro rata with other creditors of the same class.

The Plan, as well, resolves all issues involving fraudulent transfer claims and claims involving the Debtors' exempt property. The Plan devotes 2/3 of the Debtors' Homestead Proceeds, a substantial portion of which the Debtors believe would be otherwise exempt property, to payment to creditors, and further secures the first 50% of all payments required by the Plan with a mortgage on the Debtors' New Homestead.

The Plan was negotiated with the Trustee and his counsel, and with counsel for the Unsecured Creditor Committee. These negotiations proceeded over about a three month period and were quite vigorous and animated.  The Plan includes many provisions that were requested by the Trustee and many provisions that were requested by the Unsecured Creditors Committee. There are no provisions in this Plan that are inconsistent with the terms that were negotiated with the Trustee and the Unsecured Creditors Committee.

After distribution of the Agreed Non-Exempt Homestead Proceeds, proceeds from the Sale of Real Estate and the Miami Factory Proceeds and whatever other miscellaneous funds remain in these estates, the bulk of the payments under the Plan derive from the SPV Enterprise. The SPV Enterprise, at its core, exploits certain new and largely unused construction technology that manufactures, sells and employs fiber composite panels in lieu of conventional masonry or concrete block in the construction of homes, office buildings and other structures such as schools, and government buildings. Fiber composite panels are much lighter than normal building materials, can be shipped far easier and cheaper than normal building materials, and can be utilized in the construction process without the use of heavy machinery and with limited expert craftsmen.  Accordingly the build out time and expense is far less than when more conventional materials are utilized. These panels have been used to build homes, schools, low rise offices, and other facilities, and they are uniquely attractive as well in disaster situations and in underdeveloped areas.

The Debtors' expertise in connection with SPV Enterprise is summarized as follows:

1.      The Resin Formula- The Debtors have perfected a resin formula which is key to the manufacturing process.  The resin adds strength and stability to the composite panels that are used in construction.  The Debtors have the expertise to manufacture the resin required for factory production of composite panels. The resin formula continues to be perfected, even today, and the Debtors are prepared to go forward for the first time with a non-petroleum based resin, far cheaper and environmentally sound than the resin that has been utilized historically.

2.      Factories: the Debtors have modified and improved the manufacturing machinery, design and installation, for purposes of selling factories.  InnoVida had contracts for the sale of ten factories, of which four factories were built (Miami, UAE, Oman and Turkey).  This Plan contemplates the renewal of these factory contracts with the SPV and the sale of new factories elsewhere.

3.      Factory Production of Composite Fiber Panels: The Debtors have the expertise to coordinate the factory production of composite fiber panels, either in factories built or to be built, as well as the expertise to subcontract out the production of composite fiber panels.

4.      Building and architectural design: The Debtors have the knowledge to apply the construction technology to actual use.  One of the unique aspects of fiber composite panels is that the panels are not heavy and do not require heavy machinery in the construction process. However, the panels require that they be designed appropriately for deployment and installation.

5.      The Construction Process: Construction of a composite panel structure requires certain techniques and logistics.

6.      Ongoing Research and Development: The Debtors continue to perfect this technology as projects are built.  It is a work in progress. They have a certain amount of cumulative knowledge and every factory and construction project provides incremental know-how.  Ongoing testing and permitting in different jurisdictions have furthered their knowledge base.

The Plan pays all Allowed Claims in full in order of legal priority.  The initial payment is made on the Effective Date and subsequent distributions are made every four months commencing six months after the Effective Date.  Plan payments may continue for up to 5½ years. The Plan includes a provision for the right to delay up to two payments for 90 days under certain conditions and with the consent of the new SPV Board of Directors.

The Plan provides for certain enforcement provisions as well as the implementation of a mortgage on the Debtors New Homestead to secure the first 50% of payments required under the Plan.

The Debtors believe that this Plan will afford the creditors with a far greater return than they would receive if the Debtors' cases were converted to proceedings under Chapter 7 (liquidation).

## ARTICLE III: CONSOLIDATION OF CASES

On the Effective Date, the cases of C Osorio and A Osorio shall be substantively consolidated with the InnoVida Holdings LLC Cases.  Accordingly, the Osorios will be personally liable for all of the debts of each of the InnoVida Holdings LLC Cases, as will the InnoVida Holdings LLC Cases each be liable for the others' debts and the debts of the Osorios. All Allowed Claims against the Osorios and against the other entities shall be treated consistent with this Plan.

## ARTICLE IV: SOURCE OF FUNDS

The source of funds for this Plan derive from (a) the Agreed Non-Exempt Homestead Proceeds; (b) proceeds of the sales of the Switzerland Property and the Colorado Property; (c) the Miami Factory Proceeds; (d) any funds remaining in the Consolidated Estate as of the Effective Date; and (e) from the SPV Enterprise. The SPV will generate funds from the international sale of factories that manufacture fiber composite panels, the international sales of fiber composite panels, the international sales of houses and other structures that are built with fiber composite panels, and the construction of houses and other structures. The SPV will either manufacture product on its own, or subcontract out the manufacture of product.  With regard to the sale of

factories, the Debtors retain the knowledge and expertise for the SPV to coordinate the purchase and delivery of updated machinery and equipment so as to meet the requirements of new factories. With regard to the sale and construction of houses and other structures, the Debtors have perfected plans and methodologies to implement construction without the need for heavy machinery and with limited skilled labor.

The funds that become available under this Plan will be devoted to payment to creditors in accordance with **Exhibit "A."  Exhibit "A"** is a projected cash flow for the SPV Enterprise.  It is aspirational and not to be relied upon for absolute disbursement amounts.  It nevertheless sets out the Debtors' plans in respect to the SPV, and certain expectations and demonstrates the sources of the funds.

(a)    **The Agreed Non-Exempt Homestead Proceeds.**    The Agreed Non-Exempt Homestead Proceeds will derive from a sale of the Homestead Property.  Any sale mechanism of the Homestead Property will be subject to the consent of the Trustee and the Unsecured Creditors' Committee, and will represent a compromise and settlement of various claims by the Trustee and the Unsecured Creditors' Committee. The Trustee's and the Unsecured Creditors' Committee's claims include the assertion that (a) the Existing Homestead sale proceeds should not, in part qualify as exempt due to the fact that the Existing Homestead Property comprises more than one-half acre (Florida law exempts municipal homestead property that includes the residence up to one half acre); and (b) they may assert constructive trust claims against the Homestead.  The Debtors deny the extent and validity of these suggested claims.  The Debtors believe that the hypothetical difference in property value between their .94 acres with residence Existing Homestead, and a designated .5 acres with residence homestead, would be minimal and not a straight line reduction.  The Debtors also believe that constructive trust claims would not prevail for an abundance of reasons including that the Existing Homestead was purchased long before the advent of the InnoVida business, much of the mortgage proceeds went into the InnoVida business, the mortgage payments derived from both InnoVida and non-InnoVida sources, and the payments derived from InnoVida as compensation and used by the Debtors to, *inter alia,* make any mortgage payments, were appropriate compensation received from a legitimate worldwide business enterprise. However, for purposes of this Plan and this Plan only, and fundamentally to provide up-front funding for this Plan from an otherwise unavailable source, the Debtors have agreed to release their homestead claim to 2/3 of the net proceeds of sale of the Existing Homestead, and to devote these amounts to Distributions to creditors under this Plan.  In addition, in connection with the remaining Agreed Exempt Homestead Proceeds, the Debtors have also agreed to secure the first 50% of Distributions under this Plan with a mortgage on their New Homestead Property, which mortgage shall not exceed 50% of Agreed Exempt Homestead Proceeds.

(b)    **Proceeds of the sales of the Switzerland Property and the Colorado Property.** Any sale mechanism of the Switzerland Property and the Colorado Property will be subject to the consent of the Trustee and the Unsecured Creditors' Committee. The Trustee and the Unsecured Creditors' Committee will participate and must consent to, and approve, the retention of professionals and to the terms of the final sale. With regard to the Colorado Property interest, the Trustee and not the Osorios, shall negotiate with the co-owner in connection with any prospective sale of the Osorio's interest to the co-owner.

(c)    **The Miami Factory Proceeds.**  Pursuant to prior Order of the Court, the Miami InnoVida factory was sold. There are presently approximately $500,000.00 in net proceeds of sale remaining with the Trustee.  These funds will be devoted to Distributions to creditors under this Plan.

(d)    **Any funds remaining in the Consolidated Estate as of the Effective Date.**  The Trustee has collected other funds from miscellaneous sources, generally from funds left over in various InnoVida Holdings LLC Cases bank accounts.  These funds will also be devoted to Distributions to creditors under this Plan.

(e)    **The SPV Enterprise.** The funds that are projected to be forthcoming from the SPV Enterprise, are set forth as attached **Exhibit "A."  Exhibit "A"** contemplates a loan to the SPV in the total amount of $2.0 Million Dollars.  C Osorio believes that he may not require such loan in the course of the SPV Enterprise, but if the loan, or a portion of the loan will be necessary, the loan will be derived from Green Energy Ltd., a Chinese corporation (the "Lender"). The Lender's principals are not relatives or insiders of the Debtors and have never done business with the Debtors. They are totally unrelated to the Debtors. The Exhibit "A" projections are aspirational and not meant to be considered absolute projections.  The Debtors believe that all claims will be paid from Distributions within 5½ years.

## ARTICLE V:  SECURITY FOR PAYMENT OF DISTRIBUTIONS

(a)    **The Agreed Non-Exempt Homestead Proceeds.**  The Agreed Non-Exempt Homestead Proceeds will derive from a sale of the Homestead Property.  The Sale of the Homestead Property will be governed by Court Order which contemplates an auction sale under Court approved terms and conditions which mechanism has been approved by the Trustee and the UCC.  To the extent there will be any deviation from the Court Ordered auction sale, any such modification will be subject to the consent of the Trustee and the Unsecured Creditors' Committee.

The net funds from the sale shall be maintained in the Trust Account of Debtors' Counsel, subject to further order of the Court.  The Settlement Agent and Title Agent for the closing shall be the Meland Russin & Budwick P.A. law firm s consented to by the Debtors, the Unsecured Creditors' Committee and the US Trustee.  (The Trustee is Mark Meland of the Meland Russin & Budwick P.A. law firm.  The Trustee's counsel in this case is also the Meland Russin & Budwick P.A. law firm, with Michael Budwick primarily handling the matter.)  The Agreed Non-Exempt Homestead Proceeds will be retained by the Trustee pending further Court Order.

In order to provide a home for the Debtors' family pending the purchase of a New Homestead, the Debtors contemplate seeking a Court Order permitting them a reasonable sum from proceeds of sale to rent a property pending the entry of a Final Confirmation Order.  Any such order will result from a motion to be made on notice to creditors and all parties in interest and after Court hearing.

(b)    **Proceeds of the sales of the Switzerland Property and the Colorado Property.**  As indicated, any sale mechanism of the Switzerland Property and the Colorado Property will be subject to the consent of the Trustee and the Unsecured Creditors' Committee. The Trustee and

the Unsecured Creditors' Committee will participate and must consent to, and approve, the retention of professionals and to the terms of the final sale. With regard to the Colorado Property interest, the Trustee and not the Osorios, shall negotiate with the co-owner in connection with any prospective sale of the Osorio's interest to the co-owner. The proceeds of sale will be distributed according to the terms of the Plan and will be held by the Plan Representative for Distribution on the next Distribution date.

(c) **The Miami Factory Proceeds.** Pursuant to prior Order of the Court, the Miami InnoVida factory was sold. There are presently approximately $500,000.00 in net proceeds of sale remaining with the Trustee. These funds are presently being held by the Trustee. These funds will be maintained by the Trustee and devoted to, and be a part of, the Initial Distribution under the Plan.

(d) **Any funds remaining in the Consolidated Estate as of the Effective Date.** Likewise, all funds collected from miscellaneous sources, generally from funds left over in various InnoVida Holdings LLC Cases bank accounts, are presently being held by the Trustee. These funds will be maintained by the Trustee and devoted to, and be a part of, the Initial Distribution under the Plan.

(e) **The SPV Enterprise.** The funds that are projected to be forthcoming from the SPV Enterprise, will be held by the SPV Enterprise pending each Distribution. The SPV will be structured as follows:

(i) **The SPV Officers and Directors.** Claudio Osorio shall be President of the SPV and shall run the company subject to the constraints set forth herein. The other officers shall be voted into office by the Board of Directors. The Board will consist of existing members of the Unsecured Creditors' Committee willing to serve on the Board, and the Osorios. The Unsecured Creditors' Committee members shall be covered by a standard directors' and officers' liability policy to be paid for by the SPV. To the extent that the Osorios will be unable to serve on the Board in order for the Unsecured Creditors' Committee members to be covered by a directors and officers' liability policy, the Osorios will not serve on the Board, but Claudio Osorio will continue to run the company.

(ii) **The Chief Financial Officer.** The Unsecured Creditors' Committee shall choose and determine a Chief Financial Officer ("CFO") subject to the consent of C Osorio, which consent shall not be unreasonably withheld. The CFO shall be required to co-sign all checks and disbursements, including but not limited to wire transfers, of the SPV with C Osorio. The CFO shall have access to, and co-signing authority with, C Osorio on all accounts and repositories of financial assets owned by the SPV. The CFO shall report to the Board and the Unsecured Creditors' Committee and shall disclose all of the company's finances to the Board and the Unsecured Creditors' Committee as requested by either of them.

(iii) **Initial and Subsequent Compensation.** The initial compensation package and salary for C Osorio and the CFO for a period of one year shall be approved by both the Board and by the Unsecured Creditors' Committee. Thereafter, their compensation packages shall be approved only by the Board.

      **(iv)**    **Future Management.**  All management of the SPV, other than the Debtors, shall not be from the InnoVida business enterprise.

      **(f)**    **Mortgage Upon Agreed Exempt Homestead Proceeds.**  As previously indicated, a mortgage will be placed upon the New Homestead in an amount equal to 50% of the Debtors' Agreed Exempt Homestead Proceeds.  This mortgage will secure the first 50% of the payments required by the Plan.  If there is a default in payment of the first 50% of the payments required by the Plan, after consultation with the Unsecured Creditors' Committee, the Plan Representative may proceed to enforce and foreclose upon the mortgage.

      **(g)**    **Default Benchmark**. The Debtors have further agreed that 50% of all payments required by the Plan will be paid within 3 years from the Effective Date, failing which they weill be in default under the Plan.

### ARTICLE VI:  USE OF FUNDS

      Creditors will be paid *pro rata* in order of legal priority. Creditors will receive Distributions on the Effective Date and thereafter every four months commencing six months after the Effective Date. The funds will be devoted to payment to administrative claims and creditors in order of legal priority as set forth below.  Distributions will be paid pro rata to the members of each class of creditors until the class is satisfied in full.

### ARTICLE VI: ADMINISTRATIVE CLAIMS AND OPERATING EXPENSES

      1.    **Administrative Claims.**  As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims against the Consolidated Debtors will not be classified for purposes of voting or receiving distributions under the Plan. All such Claims will be treated separately as unclassified Claims and obligations on the terms set forth in this Article V.

      2.    **Administrative Claimants.**

      a.    **Ongoing Operating Costs of Business.**  All ordinary course operating costs and expenses of the Debtors outstanding on the Effective Date shall be paid in the ordinary course by the Consolidated Debtors.  No ordinary course obligations will be paid from Distributions.

      b.    **Professional Fees – Geoffrey SAaronson PA and Aaronson Schantz P.A.**  The Debtors' attorneys, Geoffrey S Aaronson, P.A. ("GSAPA") were retained and approved by the Court *nunc pro tunc* as of the Petition Date.  GSAPA, and thereafter Aaronson Schantz P.A. ("ASPA") has represented the Debtors in the course of this case. Aaronson Schantz P.A. was substituted for GSAPA effective March 1, 2011.  At this time the Debtors do not know the amount of attorneys' fees and costs that will ultimately be sought by GSAPA and ASPA. It is estimated that total fees and costs for these cases will approximate in the range of $400,000.00. The Debtors (the funds were paid by Amarilis' mother from non-estate funds) have paid GSAPA a retainer totaling $75,000.00 less filing fees, thereby leaving approximately $326,000.00 in fees and costs. GSAPA and ASPA will file a consolidated Application for Fees and Reimbursement of Expenses for the Debtors' cases which will detail the services rendered and costs incurred, prior

to Confirmation Hearing for review by the Court at Confirmation Hearing.  The Court will rule upon the Application for Fees and Reimbursement of Expenses based upon the reasonableness of the Application and prevailing caselaw.

          c.      **Professional Fees Associated with the InnoVida Holdings, LLC Cases** – There are various professionals associated with the InnoVida Holdings, LLC, Cases, including the Trustee, Mark Meland, counsel for the Trustee, Meland, Russin & Budwick, P.A., the Trustee's accountant, Marcum LLP, and counsel for the Creditors' Committee of InnoVida Holdings, LLC., Infante  Zumpano Salazar & Miloch, LLC. Each will file a consolidated Application for Fees and Reimbursement of Expenses that will detail the services rendered and costs incurred, prior to Confirmation Hearing for review by the Court at Confirmation Hearing.  The Court will rule upon each of the respective Applications for Fees and Reimbursement of Expenses based upon the reasonableness of the particular Application and prevailing caselaw.

          d.      **United States Trustee.** The Debtors may owe fees to the Office of the United States Trustee. Fees owed to the Office of the United States Trustee are determined by statute (28 USC § 1930).

3.      **Treatment of Administrative Claims**

          a.      **Professional Fees**. Except to the extent that the holder of claims for Professional Fees agrees to a different treatment, all Professional Fees associated with the professionals set forth in this Article VI, paragraph 2, including Geoffrey S Aaronson P.A., Aaronson Schantz P.A., Mark Meland, Meland, Russin & Budwick, P.A., Marcum LLP, and Infante Zumpano Salazar & Miloch, LLC. approved by the Court, are entitled to be paid on the Effective Date of the Plan, cash equal to the allowed amount of such approved fees. All professional retain all rights to object to fee applications associated with the Consolidated Cases to the extent that fees sought are excessive and inconsistent with the interests of the creditors.

          b.      **United States Trustee.** The Debtors shall pay the U.S. Trustee all sums required pursuant to 28 U.S.C. § 1930(a)(6) on the Effective Date.  Unless an application is made post Effective Date to close this case for administrative purposes only (which application shall only be made on consent of the Trustee and the Unsecured Creditors' Committee), the Consolidated Debtors will continue to pay US Trustee fees post Confirmation.  If the case is closed post Confirmation, the case will be reopened on appropriate application to the Court in order to enforce any provisions of the confirmed Plan, and for the Court to issue a final Discharge Order when appropriate.

**ARTICLE VII: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

1. **Classification and Impairment of Claims.** The following sets forth the classification of claims and whether such claims are impaired under the Plan.

| Classification | | Impaired |
|---|---|---|
| Class 1 | Allowed Secured Claim of Miami Dade County for Real Estate Taxes | Yes |
| Class 2 | Allowed Secured Claim of BankUnited | Yes |
| Class 3 | Allowed Secured Claim of BankUnited | Yes |
| Class 4 | Allowed Secured Claim of Bank of America | Yes |
| Class 5 | Allowed Secured Claim of CCH | Yes |
| Class 6 | Allowed Judgment Claim of Chris Korge | Yes |
| Class 7 | Allowed Unsecured Creditors | Yes |
| Class 8 | Allowed Unsecured Creditors of InnoVida Holdings LLC Cases | Yes |
| Class 9 | Allowed Equity Holders in InnoVida Holdings | Yes |
| Class 10 | Equity Holders | Yes |

2. **Treatment.** The following sets forth the treatment for each of the Classes of Claims and Interests.

| Classification | | Allowed Claim | Treatment |
|---|---|---|---|
| Class 1 | Allowed Secured Claim of Miami Dade County for Real Estate Taxes | | The Miami-Dade County Tax Collector has a lien for real estate property taxes on the Homestead. The Debtors will be selling their Homestead Interests in connection with this Plan and this claim shall be paid in full upon closing. |
| Class 2 | Allowed Secured Claim of BankUnited | $5,057,259.29 | Class 2, BankUnited, has a first mortgage on the Osorio Residence. Much of these funds were used by the Debtors to fund InnoVida Holdings. The mortgage payments are in default. The Debtors will be selling their residence in connection with this Plan and this claim shall be paid in full upon closing. |
| Class 3 | Allowed Secured Claim of BankUnited | $1,850,682.68 | Class 3, BankUnited, has a HELOC second mortgage on the Osorio Residence. Much of these funds were used by the Debtors to fund InnoVida Holdings. The second mortgage payments are in default. The Debtors will be selling their residence in connection with this Plan and this claim shall be paid in full upon closing. |
| Class 4 | Allowed Secured Claim | $92,134.26 | Class 4, Bank of America, has a preferred mortgage upon the Debtors' 34 foot Sea Ray |

| Classification | | Allowed Claim | Treatment |
|---|---|---|---|
| | of Bank of America | | boat.  The Debtors are surrendering the boat in satisfaction of the ship's mortgage. |
| Class 5 | Alowed Secured Claim of CCH | $136,382.00 | CCH has agreed to the InnoVida Trustee's valuation of $136,382 for the Southeast Assets.  Based on the Court approved sale of the Southeast Assets, from the proceeds of such sale, the Trustee shall pay the Miami-Dade County Tax Collector $11,422.74 for unpaid personal property taxes on the Southeast Assets. From the resulting balance of $124,959.26, Class 5 has agreed to a 10% surcharge for the benefit of the Southeast bankruptcy estate. |
| Class 6 | Allowed Judgment Claim of Chris Korge | $4,012,500.00 | Class 6 has a pre-petition judgment which was obtained in the preference period.  The claim was secured by pre-petition garnishments which have been set aside.  The allowed claim of Class 6 shall be treated pro rata as a Class 7 creditor, but shall remain separately classified. |
| Class 7 | Allowed Unsecured Creditors | Approx'y $2,872,000.00 | Class 7, Allowed Unsecured Creditors, shall be paid in full from Distributions after payment of Administrative Debts. Class 7 Creditors shall be paid pro rata with Class 6 and Class 8. |
| Class 8 | Allowed Unsecured Creditors of InnoVida Holdings | Approx'y $9,000,000.00 | Class 8 contains a substantial number of Claims based upon various incomplete factory orders and/or un-built factories.  The Debtors believe that post-confirmation, approximately half of these claims will be resolved through new contracts and/or the completion of existing projects/factories.  In the event these claims are resolved with new contracts, the claims will not be paid from Distributions. Class 8 will be paid in full from Distributions. |
| Class 9 | Allowed Equity Holders in InnoVida Holdings | Approx'y $28,000,000.00 | All of Class 9 owned 22% of InnoVida Holdings. Each member of Class 9 will have a right to elect, at any time up to two years after Confirmation, to become an equity holder in SPV. Each member of Class 9 who elects to be an equity holder will own the same percentage interest in SPV as it had in InnoVida Holdings.  The Debtors believe that once operations re-commence after |

| Classification | | Allowed Claim | Treatment |
| --- | --- | --- | --- |
| | | | Confirmation, that there will be members of Class 9 who will convert to equity interests in the SPV. Class 9, who do not convert their equity interests in InnoVida Holdings into equity in the SPV, shall be paid an amount equal to the sum of their investment(s) in InnoVida Holdings *pro rata* from Distributions after completion of payments to Classes 6, 7 and 8. |
| Class 10 | Equity Holders | | Subject to the full payment and/or conversion options set forth herein to Administrative Claims and Classes 1 through 8, the Equity Holders, the Osorios, shall retain the remaining equity in SPV. |

## ARTICLE VIII: CONVERSION RIGHTS

Prior to confirmation, Classes 7 and 8 shall have conversion rights. Members of Classes 7 and 8 shall have the right, but not the obligation, to elect to convert their claims to equity in the SPV. The conversion rights shall be subject to the following:

1.      The election shall be in writing and shall be directed to C Osorio and the Estate Representative and shall state (a) the name of the creditor; (b) the amount of claim or portion of claim that the creditor is seeking to convert to equity; (c) shall be signed by the creditor; and (d) shall be delivered to C Osorio and the Estate Representative. The election may be delivered by regular U.S. Mail or by e-mail. The election shall be irrespective of any objections to Claims that may be filed by the Debtor or any other party, and to the extent that a Claim may be modified as a result of an Objection, the election may be made only for the modified amount.

2.      The election shall be exercised prior to the conclusion of the Confirmation Hearing or within two years of the Confirmation Order. If the election is made after the commencement of Distributions, the election may relate only to the unpaid portion of the Allowed Claim.

3.      The election shall be pursuant to a formula whereby $1.00 of every claim may be converted to one and a half shares of common stock in the SPV. The SPV will have a total of 100,000,000 shares of common stock.

4.      Upon election, the Debtors will transfer stock to the new shareholder in the amount of shares as set forth in subparagraph 3 of this Article. Upon issuance, the new shareholder shall have all voting rights associated with share ownership, and shall be considered a creditor thereafter only to the extent of any remaining allowed claim.

## ARTICLE IX: ACCEPTANCE OR REJECTION OF THE PLAN

1.      **Voting Classes.**   Unless otherwise ordered by the Court, each holder of an Allowed Claim shall be entitled to vote to accept or reject the Plan.  Any holder of a Contested Claim or interest whose entire Claim or interest is objected to by the Debtor or other person qualified to object prior to Ballot Date shall not have the right to vote to accept or reject the Plan until the Contested Claim or interest is resolved unless the holder of such Contested Claim or interest requests an order from the Court pursuant to applicable Bankruptcy Rules temporarily allowing such Contested Claim or interest for voting purposes. Any Ballot received from any such holder of a Contested Claim or interest shall not be considered in determining whether the Plan has been accepted by a particular impaired Class of Claims or Interests**.**

2.      **Acceptance by Impaired Classes**.  An Impaired Class of Claims shall have accepted the Plan if the holders (other than holders designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount and more than one-half in number of the Allowed Claims voting, vote for the Plan.

3.      **Nonconsensual Confirmation (Cramdown).** The Debtor intends to request that the Court confirm the Plan in accordance with Section 1129(b) (the so-called "Cramdown" provisions) of the Bankruptcy Code if any Class or Claims or Interests votes not to accept or is deemed not to have accepted the Plan.

## ARTICLE X: MEANS OF IMPLEMENTING THE PLAN

1.      **Distributions.**   As set forth above, the Distributions shall be derived from the Agreed Non-Exempt Homestead Proceeds, Proceeds of the sales of the Switzerland Property and the Colorado Property, the Miami Factory Proceeds, any funds remaining in the Consolidated Estate as of the Effective Date, and the SPV Enterprise.

The Initial Distribution shall be made by the Trustee.  All proceeds gained from the sale of the Agreed Non-Exempt Homestead Proceeds shall be transferred to the Trustee prior to the Effective Date for the Initial Distribution.  To the extent there are pre-Effective date sales of the Switzerland Property and the Colorado Property, these proceeds of sale shall be maintained by the Trustee for the Initial Distribution. To the extent there are post-Effective date sales of the Switzerland Property and the Colorado Property, these proceeds of sale shall be maintained by the Trustee for the next Subsequent Distribution or if the Trustee is not disposed to maintain the funds, the funds will be maintained by Debtor's Counsel and turned over to the Estate Representative for Distribution. The Miami Factory Proceeds are presently being maintained by the Trustee and shall continue to be maintained by the Trustee pending the Initial Distribution. Likewise, any funds remaining in the Consolidated Estate as of the Effective Date are with the Trustee and shall continue to be maintained by the Trustee pending the Initial Distribution.

The funds generated by the SPV Enterprise in the course of its operations will be known to, and all information in connection therewith, will be available to the SPV Board and the Unsecured Creditors' Committee from both C Osorio and the CFO.  The funds will be maintained by, and will accumulate in, the SPV in its operating account, and subject to maintaining sufficient

funds to continue the SPV operation as determined by the Board, funds available for Distributions shall be delivered to the Estate Representative for Distributions.

2.    **Revesting of Assets.**  On the Effective Date, except as otherwise may be provided in the Confirmation Order with respect to the Sale of Real Estate, title to all of the Debtors' assets will revest in the Reorganized Debtors, free and clear of all claims and interests, except as otherwise expressly stated in the Plan,. After the Effective Date the Reorganized Debtors may operate the SPV and they may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided in the Plan or the Confirmation Order. As of the Effective Date, the Consolidated Debtors' Estate will be free and clear of all claims and interests except as otherwise provided in the Plan or the Confirmation Order.

## ARTICLE XI: AVOIDANCE ACTIONS

1.    **Pursuance of Avoidance Claims.**  The Trustee will be the estate representative under 11 U.S.C. § 1123(b)(3) (the "1123 Estate Representative") to pursue all avoidance claims or other litigation claims stated on behalf of the Consolidated Cases post Confirmation. The Debtors are unaware of any avoidance actions at this time. However, the 1123 Estate Representative will complete his due diligence and proceed within his discretion to pursue avoidance actions.  So long as there is no default under this Plan, no avoidance actions will be brought against C Osorio, A Osorio, or their three children.

2.    **Fees and Costs.**  Subject to Court approval, all attorney's fees and costs incurred post-Confirmation by the 1123 Estate Representative in connection with pursuing avoidance actions shall be subject to review by the Court and subject to Court approval.

3.    **Disposition of Proceeds.**  All net proceeds from the settlement and/or prosecution of avoidance actions shall be devoted to Distributions under this Plan and shall be delivered by the 1123 Estate Representative to the Estate Representative for Distribution.

## ARTICLE XII: EXEMPT PROPERTY

1.    **New Homestead.**  The Osorios shall retain their New Homestead subject a mortgage in favor of the Estate Representative as described hereinabove, to secure the first 50% of payments under the Plan.

2.    **Furniture, Furnishings, Jewelry.**  The Debtors furniture, furnishings, jewelry and clothing, (exclusive the children's furniture, furnishings and their personal jewelry) shall be valued by the a licensed appraiser chosen by the Trustee, and the Debtors may keep all items up to a total value of $50,000.00 free and clear of all claims and interests of the this Consolidated Estate. If the Debtors disagree with the valuations, they may obtain a separate valuation at their own expense, and if the Trustee thereafter cannot resolve their differences, the issues will be decided by the Court. If the valuation exceeds $50,000.00 the Debtors may designate those items they wish to keep.  The Debtors may also purchase back any items they choose that are not

designated at their fair value over a period of six months. The purchase price shall be delivered to the Estate Representative for Distributions.

       3.    **Insurance Trust.** In addition, the Debtors shall retain all interests they have in an insurance trust previously considered by the Court, and in the proceeds thereof.

## ARTICLE XIII: PROVISIONS FOR AND DISTRIBUTIONS IN RESPECT OF CONTESTED CLAIMS AND INTERESTS

       1.    **Objections to Claims.** Unless otherwise ordered by the Court, all objections to Claims shall be filed by the Debtors and/or the Trustee and served on the applicable claimant by a date that is no later 20 days prior to the Confirmation Hearing. If a Claim is objected to prior to the Confirmation Hearing, such claimant shall not have the right to vote to accept or reject the Plan until the objection is resolved, unless such claimant requests an order from the Court pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes only.

       2.    **No Distributions Pending Allowances.** Notwithstanding any other provisions of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

       3.    **Withholding and Distribution in Respect of Contested Claims - Contested Claims Reserve**. The Debtors will withhold that which would otherwise be distributed to holders of Claims within a given Class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class until the Contested Claim is resolved.

       4.    **Distribution in Respect of Contested Claims**. Upon a Contested Claim becoming an Allowed Claim, all reserved funds with respect to such Claim shall be distributed to such Claimant. Upon a Contested Claim becoming disallowed, then the reserved funds will be distributed to Allowed Claims in order of priority.

## ARTICLE XIV: EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

       1.    **Pre-Discharge Injunction.** Commencing on the Effective Date, except as otherwise expressly provided in the Plan and the Confirmation Order, all holders of Claims, whether such claims are dischargeable or non-dischargeable, shall be precluded and enjoined from asserting any right to payment from the Consolidated Debtors or their assets, or from the SPV other than as specifically provided in this Plan. All holders of Allowed Claims, whether or not dischargeable, shall be precluded and enjoined from asserting any right to payment from the Consolidated Debtors or from the SPV other than as specifically provided in this Plan. Without this injunction, a single creditor could frustrate the ability of the Consolidated Debtors to effectively pay all Allowed Claims. This provision is reasonably necessary to insure payment to all creditors under this Plan. Any creditor who attempts to collect on a debt other than under the terms of this plan will be in violation of this injunction.

2.      **Discharge**. As of the completion of payments under the Plan, the Debtors shall be discharged and released from all Claims and shall hold the assets received or retained by them and pursuant to the Plan, free and clear of all liabilities, liens, claims and obligations or other claims of any nature against the Debtors or their estate  As of the completion of payments under the Plan, and except as otherwise expressly provided in the Plan and the Confirmation Order, all holders of Claims shall be precluded forever from asserting against the Debtors' estates, the Debtors or their assets, any other or further liabilities, liens, obligations, claims or equity interests, arising or existing prior to the Effective Date, that were or could have been the subject of any Claim, whether or not Allowed.

If the Debtors default under the Plan, the Debtors waive any claim or right to discharge.

3.      **Post-Discharge Injunction**.  In accordance with section 524 of the Bankruptcy Code, the discharge provided by this Article and section 1141 of the Bankruptcy Code, among other things, acts as a permanent injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims or Interests against the Debtors.  All Classes, and the members thereof, all Creditors and all Interested Parties shall be bound by this injunction.

4.      **Post-Petition Non-Dischargeability Actions.**  All Creditors who have filed non-dischargeability actions against one or both of the Debtors during the course of this case, remain subject to the Pre-Discharge Injunction set forth in paragraph 1 herein, the Discharge provisions set forth in paragraph 2 herein, and the Post-Discharge Injunction set forth in paragraph 3 herein, notwithstanding whether the non-dischargeability action has been adjudicated or what stage the litigation remained as of the Confirmation Date.  As of the Confirmation Date, and prior thereto if agreed by the parties, all non-dischargeability actions will be dismissed without prejudice and subject to payment according to the terms of this Plan.  If there is a payment default under the Plan, the Debtors are not discharged and therefore the non-dischargeability actions will be moot.

5.      **Exculpation**.  Except as otherwise specifically provided herein, the Debtors, the Trustee, and the Unsecured Creditors' Committee, their officers, directors, members, managers, employees, representatives, attorneys, financial advisors, agents, affiliates, or any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a Claim or an interest, or any other party in interest, or any of their respective officers, directors, employees, representatives, attorneys, financial advisors, partners, members of partners, managers or members of partners, or agents, or affiliates, or any of such parties' successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

6.      **Savings Clause**.  If any article, section, terms and/or subdivision of this Plan is ruled by the Bankruptcy Court to be improper or ineffective, or, if the Debtor decides to unilaterally remove any article, section, subsection, term, and/or provision of this Plan at the Confirmation Hearing, this Plan may proceed to confirmation at the Debtors' option, and be

confirmed without the article(s), section(s), subsection(s), term(s), and/or provision(s) found to be improper or ineffective and/or unilaterally removed by the Debtor at the Confirmation Hearing.

       7.      **No Waiver of Causes of Action**. No provision of this Plan or the acceptance of any distributions hereunder shall compromise, settle or release any claims or causes of action belonging to the Debtors.  On the Effective Date, the Reorganized Debtors shall be authorized to commence and prosecute any and all claims that arose before, on or after the Petition Date. Proceeds, if any, realized from any such claims shall be added to the distributions under the Plan except to the extent distributions may be to the party to whom the claim was directed.

## ARTICLE XIV: EXECUTORY CONTRACTS AND UNEXPIRED LEASES

       1.      **Leases and Executory Contracts**. On the Effective Date, the following executory contracts of the Debtors will be deemed assumed by the SPV, unless specifically rejected by separate motion filed prior to the Confirmation Hearing:

Building Projects

| Client | Loca-tion | Nature of Project | Contract Value in $ | Advances (Liability) | $ Needed To Finish | Account Rec | Status Project |
|---|---|---|---|---|---|---|---|
| World Food Program Haiti | Haiti | Community of 80 houses (1,2 & 3 Bedrooms) plus Buildings for Kitchen, Dinning Hall, Reception, Gym, Mediq  Room, Bar and Clinic. Buildings are to be delivered finished and furnished. | $2,300,000 | $1,850,000 | $0 | $450,000 | Client Finished the Project. |
| World Vision | Haiti | School for 600 Children, consisting of 15 classrooms, Kitchen and Dining, Administration, Bathroom facilities, Storage and Media Buildings | $800,000 | $450,000 | $0 | $350,000 | Client finished the project with former InnoVida Employees |
| University of Haiti Sponsored by Clinton-Bush Fund | Haiti | Administrative Offices for the University of Haiti Two Story building | $180,000 | $135,000 | $0 | $45,000 | Client finished the project with InnoVida's Subcontractors In Haiti |

| | | | | | | |
|---|---|---|---|---|---|---|
| Hand in Hand | Haiti | School for 600 Children and Housing for Teachers Includes 15 Classrooms, Library, Clinic, Administration building, Media Building Music Building, Bathroom Facilities, 7 houses for teachers | $2,300,000 | $750,000 | $1,550,000 | $1,550,000 | All buildings designs and structural calculations were done. Administrative Building, Library Building, Music Building, Clinic Building, Bathroom Facilities and Director's house were completed and ready to be shipped |
| Portofino Duplex | Haiti | 10 Units - 2 story town houses Haiti | $1,080,000 | $200,000 | $864,000 | $880,000 | Design was being changed due to client's request. 50% of the total cost was financed by a local bank. Client got the approval by the bank on March 1st. Client was expected to pay additional $200,000 in March 2011 |
| Allied School | Haiti | Small School | $70,000 | $35,000 | $0 | $0 | On March 2011, we recived notification from Client that they did not have clear title of the land, so they needed to cancel the project. |
| Laboratory | Haiti | Laboratory | $75,000 | $35,000 | $0 | $40,000 | This project is being finished by InnoVida's Former Employees. |
| Nuns School | Haiti | Nuns School | $70,000 | $35,000 | $20,000 | $35,000 | All Building material was shipped to Haiti. Until missing to pay is labor and slab. |
| Arkel Camp in Sudan | Arkel Camp in Sudan | Camp to house 300 doctors and nurses in Sudan | $700,000 | $525,000 | $35,000 | $175,000 | 15 Containers were at the Port of Kenia with more than 95% of the Building Materials needed to complete ths project. Client was paying for the wokers and Expenses of InnoVida Supervisors assigned to this project. Client was paying for Customs and local transportation from Kenia to Sudan |
| Martin Serrano | Venezuela | Sample Houses for a development | $125,000 | $55,000 | $20,000 | $50,000 | houses are ready to be shipped at the Factory |
| | | Total | $7,700,000 | $4,070,000 | $2,489,000 | $3,575,000 | |

InnoVida Factory Projects - As of March 04, 2011

| Client | Location | Nature of Project | Total Project | Total Paid | Total Needed to Finish | Total to Collect | Status Project |
|--------|----------|-------------------|---------------|------------|------------------------|------------------|----------------|
| Tanzania | Dar Es Salaam | Batch Line | $4,300,000 | $2,000,000 | $0 | $2,300,000 | Factory finished. |
| Angola | Luanda | Batch Line | $4,600,000 | $3,000,000 | $250,000 | $1,600,000 | 65% pg Parts at factory site. Balance to be shipped from UAE. |
| RAK II | UAE | Batch Line | $4,300,000 | $4,300,000 | $100,000 | $0 | 95% Complete. |
| Brazil | Curitiba | Contonous Line | $8,600,000 | $3,300,000 | $0 | $5,300,000 | Credit Insurance needs to be negotiated again so project will self-finance. |
| | | Total | $21,800,000 | $12,600,000 | $350,000 | $9,200,000 | |

## ARTICLE XV: EFFECTIVENESS OF THE PLAN

1.      **Conditions Precedent.**  The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full or waived in accordance with the provisions specified below:

a.      **Entry of Confirmation Order.**  The Court shall have entered the Confirmation Order confirming and approving the Plan in all respects by the Confirmation Date and the Confirmation Order shall become a Final Order.

b.      **Effect of Confirmation Order.**  Upon entry of the Confirmation Order, the Consolidated Debtors shall be bound to abide by all provisions of the confirmed Plan, and the Creditors shall be bound to abide by and accept all payments made pursuant to the confirmed Plan.

c.      **Waiver of Deadlines or Other Conditions.**  As contemplated by the definition of Confirmation Date and Effective Date herein, the deadlines set forth above may be extended (if necessary) or as may be necessary to reasonably accommodate the Court's Calendar.

d.      **Default Remedies.**  In the event that the Reorganized Debtors are unable to make a timely Distribution commencing with the Third Distribution, the Debtors shall have the automatic right to extend the payment date up to 90 days on two occasions. This right shall be exercised only with authority of the Board of Directors, by providing notice to the Trustee and to the Creditors' Committee. Upon any default, the Consolidated Debtors shall be entitled to a written notice and a ten day opportunity to cure. If the Debtors fail to cure on a timely basis, the Creditors' Committee, the Estate Representative, or the Trustee may proceed to enforce this Plan in State Court; or they may seek to reopen this case in the Bankruptcy Court.  In such instance, these Consolidated Cases will proceed under Chapter 7 of the Bankruptcy Code.

In the event of an uncured default, on application of the Unsecured Creditors' Committee these cases will be converted to proceedings under Chapter 7. Any statutes of limitations as to any claims of any creditors of the Debtors shall be tolled effective as of their petition date. Any

litigation by prepetition creditors against the Debtors will be deemed tolled for the period of these Consolidated Chapter 11 Cases.


## ARTICLE XVI: ADMINISTRATIVE PROVISIONS

1.      **Retention of Jurisdiction**.  The Court shall retain jurisdiction over all matters arising in or related to the Chapter 11 Case and the Plan for the following purposes:

a.      To hear and determine pending motions for the assumption or rejection of the executory contracts or unexpired leases and disputed issues concerning termination of contracts, if any are ending, and the allowance of Claims resulting therefrom;

b.      To determine any and all pending adversary proceedings, contested matters, applications and unresolved motions;

c.      To hear and determine timely and proper objections to Claims and Interests filed both before and after the Confirmation Date by the Reorganized Debtors, including objections to the classification, estimation, establishment of priority or status of any Claim or Interest, and to allow or disallow any Contested Claim or Interest, in whole or in part, as contemplated in the Plan;

d.      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

e.      To hear and determine all claims and causes of action to recover Assets of the Debtors or Reorganized Debtors wherever located, including any avoidance causes of action under applicable sections of the Bankruptcy Code;

f.      To hear and determine all controversies arising in connection with the Plan and other matters provided for in the Confirmation Order;

g.      To hear and determine all controversies arising in connection with the Distributions contemplated hereunder and enter a final decree closing the Chapter 11 case.

2.      **DIP Reporting.**  The Debtors will continue to provide and file DIP reports on a quarterly basis post Confirmation until all payments have been made under the terms of this Plan.

3.      **DIP Fees.**  The Consolidated Debtors will pay quarterly DIP Fees as one case, and not more than one case.

## ARTICLE XVII: MISCELLANEOUS

1.      **Existing Organizational Documents**.  The SPV Organizational Documents shall not be amended, modified or changed in any respect that would affect the Distributions required by this Plan.

2.    **Headings**.  Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan for any purpose.

3.    **Binding Effect**.  The Plan shall be binding on and inure to the benefit of the Debtors, Reorganized Debtors, and all of the holders of Claims and Interests and their respective successors and assigns. The Debtors shall be obligated to make the Distributions as provided for in the Plan, and the Creditors shall be obligated to accept the Distributions as provided for in the Plan in satisfaction of their Claims.

4.    **Modifications of Plan**.  Debtors agree not to seek to modify the Plan post confirmation under 11 U.S.C. § 1141(5)(B). However, after entry of the Confirmation Order, the Debtors may amend or modify the Plan and documents related thereto in accordance with, and to the extent permitted by, section 1127(b) of Bankruptcy Code and Bankruptcy Rule 3019 to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

5.    **Filing or Execution of Additional Documents**.  On or before the Effective Date, the Debtors shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

6.    **Cooperation.** The Debtors shall cooperate with the Trustee and the Unsecured Creditors' Committee in connection with the Trustee and the Unsecured Creditors' Committee performing their obligations and duties under this Plan.  This obligation includes but is not limited to assisting the Trustee in his fraudulent transfer analysis and more specifically, in connection with obtaining foreign account statements and other related information.

7.    **Passports.** On the Effective Date, Geoffrey S Aaronson shall deliver C Osorio's Passports to the SPV Board, which shall hold and maintain them is a secured safe repository for a period of 18 months following the Confirmation Order.  During this period, the Passports may be released to C Osorio to the extent that he needs to travel.  In such instance, he will provide at least ten days advance notice to the Board and to the Trustee of the reasons for his travel, and the Board will not unreasonably withhold the Passports.  If C Osorio needs to travel, A Osorio will surrender her Passport to the Board during the time period that C Osorio is traveling and upon the return of C Osorio, then the Board will return her Passport to her. At the expiration of 18 months following the Confirmation Order, the Passports will be released to C Osorio and there will be no further need to proceed under these provisions.

8.    **Notices**.  All notices, requests and demands and other communications to or upon the Debtors, Parties, including any objections to the Disclosure Statement, shall be in writing and shall be delivered by e-mail, in person or by courier, or by U.S. Mail (postage prepaid) or by facsimile transmission to:

Geoffrey S. Aaronson, Esq.
Seven L Beiley, Esq.
**Aaronson Schantz P.A.**
Miami Tower
100 S.E. 2nd St., 27th Floor
Miami, Florida 33131
Telephone: 786-594-3000
Telefax: 305-675-3880
gaaronson@aspalaw.com
sbeiley@aspalaw.com

Respectfully submitted,

Claudio Eleazar Osorio                           **Aaronson Schantz P.A.**

s/Claudio Eleazar Osorio                          s/Geoffrey S Aaronson
                                                  Geoffrey S. Aaronson
                                                  Florida Bar No. 349623
                                                  Steven L. Beiley
Amarilis Moran Osorio                             Florida Bar No. 912549
                                                  Miami Tower
s/Amarilis Moran Osorio                           100 SE 2nd ST, 27th Floor
                                                  Miami, Florida 33131
                                                  Tel. 786.594.3000
                                                  Fax 305.675.3880
                                                  E-mail gaaronson@aaronsonpa.com
                                                  E-mail sbeiley@aspalaw.com
                                                  *Attorney for Debtors*